[No. S097340. July 1, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
JOMO K. BLAND, Defendant and Appellant.

**COUNSEL**

Mark L. Christiansen, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Carol Wendelin Pollack, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Marc E. Turchin, Acting Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—We granted review to resolve issues involving transferred intent and proximate causation.

In its classic form, the doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another. The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder. (See generally *People v. Scott* (1996) 14 Cal.4th 544 [59 Cal.Rptr.2d 178, 927 P.2d 288] (*Scott*).) Whatever its theoretical underpinnings, this result is universally accepted. But conceptual difficulties arise when applying the doctrine to other facts. Here, defendant shot at three persons, killing one and injuring, but not killing, the other two. A jury convicted him of one first degree murder and two premeditated attempted murders. We must decide whether defendant's intent to kill the murder victim transfers to an alleged attempted murder victim.

We conclude that transferred intent applies even when the person kills the intended target. Intent to kill is not limited to the specific target but extends to everyone actually killed. We also conclude, however, that the doctrine does not apply to an inchoate crime like attempted murder. A person who intends to kill only one is guilty of the attempted (or completed) murder of that one but not also of the attempted murder of others the person did not intend to kill. Thus, in this case, whether defendant is guilty of the attempted murder of the two surviving victims depends on his mental state as to those victims and not on his mental state as to the intended victim. Finally, we conclude that the trial court did not prejudicially misinstruct the jury as to these principles.

The jury also found true sentence enhancement allegations that defendant intentionally and personally discharged a firearm and proximately caused

great bodily injury or death. (Pen. Code, § 12022.53, subd. (d); hereafter section 12022.53(d).) The trial court instructed the jury on the elements of this allegation, but did not define proximate causation. We conclude the court erred in not defining proximate causation, but the error was harmless. A correct instruction on proximate causation could not have aided defendant.

Accordingly, we reverse the judgment of the Court of Appeal, which reversed the attempted murder convictions and enhancement findings.

## I. FACTS AND PROCEDURAL HISTORY

Defendant was a member of the Insane Crips gang. Murder victim Kenneth Wilson, nicknamed Kebo, belonged to the Rolling 20's Crips. In the evening of March 6, 1999, Wilson drove through a Long Beach neighborhood with passengers Skylar Morgan and Leon Simon, who, it appears, were not gang members. Stating that he saw someone he knew, Wilson turned his car around and drove to where defendant was standing with another man. The other man pulled out a gun, and defendant asked Wilson if he was Kebo. Wilson said he was, and the man put the gun away.

The other man said he and defendant were Insane Crips. Wilson told them his passengers, Morgan and Simon, were not gang members. Invited to get out of the car and talk, Wilson instead turned his car around again. He said he would drop off his passengers and return. Defendant approached the driver's side of the car, said, "So you Kebo from 20's," and started shooting into the vehicle with a .38-caliber handgun. Wilson managed to start driving away. As he did so, both defendant and the other man fired at the car. The car crashed into a pole. Wilson died of a gunshot wound to the chest. Simon was shot in the liver and Morgan in the shoulder, but both survived. The evidence was not clear who fired the shots that hit Morgan and Simon.

As relevant here, a jury convicted defendant of the first degree murder of Wilson and the premeditated attempted murders of Simon and Morgan. It also found true as to these counts that he "intentionally and personally discharged a firearm and proximately caused great bodily injury . . . or death to any person other than an accomplice . . . ." (§ 12022.53(d).) The Court of Appeal reversed the two attempted murder convictions, finding the trial court erroneously instructed the jury on the doctrine of transferred intent. It also reversed the remaining section 12022.53(d) enhancement, finding the court prejudicially erred in not defining proximate causation. Justice Ortega dissented on both points.

We granted the Attorney General's petition for review.

## II. DISCUSSION

### A. *Transferred Intent*[1]

#### 1. *Procedural Background*

One possible interpretation of the evidence is that defendant intended to kill the one he and his cohort did kill—Wilson, the rival gang member—but he did not specifically target nonmembers Morgan and Simon. In his opening argument to the jury, the prosecutor argued that defendant intended to kill Morgan and Simon. But he also argued that "the defendant is actually pointing a gun and pulling the trigger. The intent, as we say in the law, follows the bullet; wherever you are pointing it, that's where it goes." In his argument, defense counsel responded that there was no evidence that any of the shots were aimed at Morgan or Simon. In reply, the prosecutor said, "One of the other things counsel said concerning the attempt murder counts . . . one of the instructions talks about that, it is the concept of transfer intent. You don't get a benefit if you try to kill one person and inadvertently kill another, that that was not your intent. An attempt follows the bullets, kills a different person, the crime so committed is the same as though you originally had given that intended target. The law does not excuse bad marksmanship or hitting other people. He is responsible for each of those acts."

After the arguments, the prosecution requested that the jury instructions include one on "transferred intent" pursuant to CALJIC No. 8.65. He explained that "the argument of the defense was basically [defendant] didn't necessarily intend to shoot the other people. And I felt it necessary to respond to that with transfer intent." The court agreed to give the instruction and thus told the jury: "When one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed." (CALJIC No. 8.65.)

During deliberations, the jury asked the court, "Does finding premeditation in count 1 [murder of Wilson] follow over to count 3 [attempted murder

---

[1]The term "transferred intent," if taken literally, is underinclusive. In his concurring opinion in *Scott*, Justice Mosk suggested that the term "transferred malice" might be more accurate (*Scott, supra,* 14 Cal.4th at p. 554 (conc. opn. of Mosk, J.)), but even that term is too narrow. Someone who premeditates a killing but kills the wrong person is guilty of a premeditated, not just intentional, murder. (*People v. Sanchez* (2001) 26 Cal.4th 834, 850-851 [111 Cal.Rptr.2d 129, 29 P.3d 209].) A more accurate designation might be "transferred mental state." However, because the term "transferred intent" is so well established in the cases, we will continue to use it on the understanding that it is not limited merely to intent but extends at least to premeditation.

of Morgan]?" In open court, the foreperson said that regarding count three, "We seem to be unable to distinguish willful, deliberate and premeditation. . . . [W]e see quite clearly that it is willful and possibly deliberate but the word 'and' [in the instruction] is causing a problem because we are having difficulty as a group establishing that there is premeditation in that particular count 3." The court explained that the jury had to "make a distinct finding for each count where that question arises. It arises in counts 1, 2 and 3. So what you will need to do is make a determination specifically as to each count, whether you find willful, malicious, premeditation, if you find those as to each count. You make a separate finding. [¶] You may find, for instance, that it applies . . . as to count 1, but you may find that there are some facts or distinction between count 1, count 2 and count 3 in which you don't find all of those factors existent. That's okay to do that. One does not necessarily lead and follow to the other. You have to look at each count separately."

Outside the jury's presence, the prosecutor asked the court to reread CALJIC Nos. 8.65, 8.66 (defining attempted murder), and 8.67 (defining the "willful, deliberate, and premeditated" requirements of the attempted murder charges). The court then referred the jury to "three jury instructions that may assist you in reaching a determination. One is 8.65, the other is 8.66, and the third is 8.67. Those are instructions that had been read to you and they are within the packet. If you wish to take a look at those, it may be helpful. [¶] With respect to each count, each count is determined separately one from another. So a finding on one does not necessarily lead to a finding on another. It may assist. [¶] And, lastly, you are correct in that the finding of the particular factors is in the conjunctive, that is, that you must find all of the factors or you are unable to make the finding."

The foreperson said the comments helped, and the jury resumed deliberating, eventually reaching its verdict without further communication with the court.

2. *The Applicable Law*

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187, subd. (a).) Except for the reference to a fetus, the Legislature enacted this statute in 1872 intending to codify the common law of murder. (*Keeler v. Superior Court* (1970) 2 Cal.3d 619, 624-625 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].) Transferred intent was one of the common law doctrines that "survived the enactment of California's murder statute." (*Scott, supra,* 14 Cal.4th at p. 549, citing *People v. Suesser* (1904) 142 Cal. 354, 366-367 [75 P. 1093].) █ "Under the

classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had ' "the fatal blow reached the person for whom intended." ' (*People* v. *Suesser* (1904) 142 Cal. 354, 366 [75 P. 1093] . . . .) In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do." (*Scott, supra*, at p. 546.)

In *Scott*, we upheld convictions of both the murder of an unintended victim who was killed and attempted murder of the intended target, who survived. (*Scott, supra*, 14 Cal.4th 544.) Here, arguably, the reverse occurred: Defendant killed his intended target and wounded but did not kill unintended victims. Thus, the question is whether transferred intent applies to attempted murder charges when the defendant kills his sole intended target and shoots but does not kill others. Although the briefs and cases have generally analyzed this as a single question, we actually have two distinct questions best analyzed separately: (1) Does an intent to kill transfer to an unintended victim when the intended target is killed? (2) Does transferred intent apply to attempted murder?

### a. *Transferred Intent Applies When the Intended Target Is Killed*

In *People v. Birreuta* (1984) 162 Cal.App.3d 454 [208 Cal.Rptr. 635] (*Birreuta*), the defendant was convicted of two first degree murders. He denied intending to kill one of the victims. The court instructed the jury on transferred intent. The Court of Appeal found the instruction erroneous, reasoning that transferred intent does not apply when the intended target is killed. "The function of the transferred intent doctrine is to insure the adequate punishment of those who accidentally kill innocent bystanders, while failing to kill their intended victims. But for the transferred intent doctrine, such people could escape punishment for murder, even though they deliberately and premeditatedly killed—because of their 'lucky' mistake. . . . [¶] When the intended victim is killed, however, there is no need for such an artificial doctrine. The defendant's premeditation, deliberation, intent to kill and malice aforethought are all directly employable in the prosecution for murdering his intended victim. The accidental killing may thus be prosecuted as a manslaughter or second degree murder without ignoring the most culpable mental elements of the situation. . . . [¶] We conclude that the interests of justice are best served by differentiating between killers who premeditatedly and deliberately kill two people, and killers who only intend to kill one person, and accidentally kill another. Both types should be punished for both killings, but the former type is clearly

more culpable. In the first situation, the killer has committed two intended first degree murders. In the second situation . . . the killer has committed one first degree murder and one second degree murder or manslaughter. If the transferred intent doctrine is applicable when the intended victim is killed, this difference disappears. Accordingly, we hold that the transferred intent doctrine does not apply in this case because . . . the intended victim . . . was killed." (*Id.* at pp. 460-461.)

The *Birreuta* court cited but found unpersuasive contrary dicta in an earlier case. (*Birreuta, supra,* 162 Cal.App.3d at pp. 458-459, citing *People v. Carlson* (1974) 37 Cal.App.3d 349 [112 Cal.Rptr. 321].) In *Carlson,* the defendant was convicted of voluntary manslaughter of his wife and murder of the fetus she was carrying. The court applied transferred intent. "If, under the evidence, defendant intended to kill his wife but by accident or inadvertence he killed the unborn child, the proper principle to be applied is that which operates under the doctrine of 'transferred intent.' " (*People v. Carlson, supra,* 37 Cal.App.3d at p. 356.) The court had "no doubt that the doctrine of 'transferred intent' applies even though the original object of the assault is killed as well as the person whose death was the accidental or the unintended result of the intent to kill the former." (*Id.* at p. 357.) This language was, as *Birreuta* noted, dicta because the *Carlson* court ultimately reversed the murder conviction on unrelated grounds. (*Id.* at pp. 357-358.)

There is some force to *Birreuta*'s argument that a person who intends to kill two persons and does so is more culpable than a person who only intends to kill one but kills two. But we find no legally cognizable difference between the two persons. Because the facts in *Scott* did not present the *Birreuta* question, we "decline[d] to express a view on that decision." (*Scott, supra,* 14 Cal.4th at p. 552.) But *Scott* is instructive. There we affirmed convictions of two crimes against separate victims based on an intent to kill—attempted murder and, on a transferred intent theory, murder—even though the defendant may have intended to kill only one person. We rejected the defendant's argument that he was improperly "being prosecuted as if he intended to kill two people rather than one." (*Id.* at p. 551.) "Contrary to what its name implies, the transferred intent doctrine does not refer to any actual intent that is capable of being 'used up' once it is employed to convict a defendant of a specific intent crime against the intended victim." (*Id.* at p. 550.)

Similarly, a person's intent to kill the intended target is not "used up" once it is employed to convict the person of murdering that target. It can also be used to convict of the murder of others the person also killed. When one intends to kill and does so, the killing is hardly an accident, even if the

specific victim or victims are unintended. (Cf. *Birreuta, supra,* 162 Cal.App.3d at p. 460 [referring to "accidentally kill[ing] innocent bystanders"].) The *Birreuta* court believed there is no need to transfer intent when the intended target is killed because the defendant can be convicted of murder of the intended victim. (*Ibid.*) But this point is not dispositive. It may not be *necessary* to find that intent to kill extends to all persons actually killed, but we believe it is *appropriate* to do so.

The *Birreuta* rule presents conceptual difficulties under other facts. *Birreuta* says that a person who, premeditatedly intending to kill one person, kills the target and an unintended victim is guilty of one first degree murder and one second degree murder or perhaps manslaughter. But what if, instead of killing the target, the same person with the same intent kills *two* unintended targets? Is that person guilty of two first degree murders or, like the person who kills two, including the target, only of one first degree murder and one lesser crime? *Birreuta* would seem to permit only one conviction of first degree murder. But if so, how? Is the transferred intent "used up" once it is transferred to one victim? How can that be reconciled with *Scott*? Moreover, if it *is* used up, on which of the two unintended victims is it used? Which of the unintended victims, who are equally dead and to whom the person had the same mental state, was the victim of a first degree murder and which of a lesser crime? How can a court make this sensible to a jury?

Justice Mosk's concurring opinion in *Scott*, which reached the same result as the majority but by a different, and broader, route, supports the conclusion that *Birreuta* was incorrect. He rejected the "assumption" that "malice aforethought exists in the perpetrator only in relation to an intended victim." (*Scott, supra,* 14 Cal.4th at p. 555 (conc. opn. of Mosk, J.).) Instead, he argued, malice, either express or implied, "does not exist in the perpetrator only in relation to an intended victim. True, an unlawful intent to kill almost always happens to be directed at an intended victim. . . . But there is no requirement of an unlawful intent to kill *an intended victim*. The law speaks in terms of an unlawful intent to kill *a* person, not *the* person *intended to be killed*. (See Pen. Code, § 188 [providing that malice aforethought is 'express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature'] . . . .)" (*Id.* at pp. 555-556.)

Whether one conceptualizes the matter by saying that the intent to kill the intended target transfers to others also killed, or by saying that intent to kill need not be directed at a specific person, the result is the same: assuming legal causation, a person maliciously intending to kill is guilty of the murder

of all persons actually killed. If the intent is premeditated, the murder or murders are first degree.[2]

Cases from other jurisdictions have not treated *Birreuta, supra,* 162 Cal.App.3d 454, kindly. Several have expressly disagreed with it. (*State v. Hinton* (1993) 227 Conn. 301 [630 A.2d 593, 598-599]; *Ochoa v. State* (1999) 115 Nev. 194 [981 P.2d 1201, 1204-1205]; *State v. Worlock* (1990) 117 N.J. 596 [569 A.2d 1314, 1325]; *State v. Fennell* (2000) 340 S.C. 266 [531 S.E.2d 512, 515-518] [but citing *Scott, supra,* 14 Cal.4th 544, with approval].) The three later opinions each quote with approval the New Jersey Supreme Court: "When a defendant contemplates or designs the death of another, the purpose of deterrence is better served by holding that defendant responsible for the knowing or purposeful murder of the unintended as well as the intended victim. Hence, we reject defendant's argument that the successful killing of the intended victim prevents the 'transfer' of that intent to an unintended victim." (*State v. Worlock, supra,* 569 A.2d at p. 1325.) The Connecticut Supreme Court added that "the law does not give the defendant a discount on the second and subsequent victims of his intentional conduct." (*State v. Hinton, supra,* 630 A.2d at p. 598.) Other cases predated *Birreuta* but reached the opposite conclusion. (*United States v. Sampol* (D.C. Cir. 1980) 636 F.2d 621, 674 ["There are even stronger grounds for applying the principle [transferred intent] where the intended victim is killed by the same act that kills the unintended victim"]; *United States v. Weddell* (8th Cir. 1977) 567 F.2d 767, 769-770.)[3]

---

[2]Some commentators have criticized use of the transferred intent doctrine, although generally not the result. In *Scott,* we noted that Dean Prosser "aptly describes it [as] a 'bare-faced' legal fiction." (*Scott, supra,* 14 Cal.4th at p. 550, citing Prosser, *Transferred Intent* (1967) 45 Tex. L.Rev. 650, 650; see also *Scott, supra,* at p. 554 (conc. opn. of Mosk, J.) [describing it as "a peculiarly mischievous legal fiction"].) Perkins, perhaps the doctrine's harshest critic, argues that it "has no proper place in criminal law" because it "has the vice of being a misleading half-truth, often given as an improper reason for a correct result, but incapable of strict application." (Perkins & Boyce, Criminal Law (3d ed. 1982) ch. 7, § 8, p. 921.)

Nevertheless, because courts in this state and throughout the nation have long discussed the problem in terms of transferred intent, we think it preferable to continue to use the familiar term, while hopefully clarifying when and how the doctrine does and does not apply. (See fn. 1, *ante.*)

[3]In *Ford v. State* (1992) 330 Md. 682 [625 A.2d 984], the Maryland Court of Appeals cited *Birreuta, supra,* 162 Cal.App.3d 454, with approval but, as we discuss in the next subpart, that decision presents the question whether transferred intent applies to an inchoate crime like attempted murder and not the *Birreuta* issue. The same court later said that it "stated in *Ford* that transferred intent does not apply to attempted murder." (*Poe v. State* (1996) 341 Md. 523 [671 A.2d 501, 504] [presenting the same issue as in *Scott, supra,* 14 Cal.4th 544, and deciding it the same way].) A concurring opinion in *Ford* signed by three justices disagreed with *Birreuta*'s holding. (*Ford v. State, supra,* 625 A.2d at pp. 1004-1005 (conc. opn. of McAuliffe, J.).)

The court in *Harvey v. State* (1996) 111 Md.App. 401 [681 A.2d 628] considered this question in detail. It first discussed the conceptual difficulties it presents. "Some of the early, and simplistic, explanations of the transferred intent doctrine gave rise to some troubling conceptual problems. The classic formulation envisioned a single *actus reus*—the death of the unintended victim. If the single *mens rea*—the specific intent to kill the intended victim, *e.g.*—could then be 'transferred' to the unintended victim, the unitary *mens rea* could combine with the unitary *actus reus* to produce one unitary and doctrinally tidy crime. . . . [¶] The simple arithmetic explanation proved inadequate, however, when there was more than one *actus reus*. Suppose, in addition to the death of the unintended victim, the intended victim had also been killed or, at least, wounded by the bullet in its flight. If the *mens rea* had to be used to prove the crime against the intended victim, what was then left to be 'transferred' to the case involving the unintended victim? The conceptual problem also arose even where the deadly force missed the intended victim completely but the State nonetheless sought to charge the assailant with the inchoate crime of intent to murder or assault with intent to murder. If the *mens rea* were in limited supply, to which of two crimes should it be allocated? How could a single *mens rea* be made to do double duty?" (*Id.* at pp. 636-637.)

The court then supplied the answer. As we did in *Scott, supra,* 14 Cal.4th 544, it rejected the notion that transferring the intent uses it up. "By thinking of the *mens rea* in such finite terms—as some discrete unit that must be either here or there—we have created a linguistic problem for ourselves where no real-life problem existed. Criminal *acts*, consummated or inchoate, are discrete events that can be both pinpointed and counted. A *mens rea*, by contrast, is an elastic thing of unlimited supply. It neither follows nor fails to follow the bullet. It does not go anywhere. It remains in the brain of the criminal actor and never moves. It may combine with a single *actus reus* to make a single crime. It may as readily combine with a hundred *acti rei*, intended and unintended, to make a hundred crimes, consummated and inchoate. Unforeseen circumstances may multiply the criminal acts for which the criminal agent is responsible. A single state of mind, however, will control the fact of guilt and the level of guilt of them all." (*Harvey v. State, supra,* 681 A.2d at p. 637.)

Relying heavily on *Poe v. State, supra,* 671 A.2d 501—Maryland's equivalent of *Scott, supra,* 14 Cal.4th 544—the court concluded that "the guilt of the assailant (or his accomplice) *vis-à-vis* the unintended victim was unaffected by the fate of the intended victim. As far as the case with respect to the unintended victim was concerned, it made no difference whether the intended victim had been 1) aimed at and missed, 2) hit but only wounded,

or 3) hit and killed. It similarly made no difference whether the assailant (and/or accomplice) had been charged with a crime against the intended victim or not. There was no danger of depleting the *mens rea*. [¶] The 'transferred' *mens rea vis-à-vis* the unintended victim or victims will not be affected in any way, therefore, by what happens to the intended victim." (*Harvey v. State, supra,* 681 A.2d at p. 637.)

We conclude that *People v. Birreuta, supra,* 162 Cal.App.3d 454, was incorrect and disapprove it to the extent it is inconsistent with our opinion. Intent to kill transfers to an unintended homicide victim even if the intended target is killed.[4]

### b. *Transferred Intent Does Not Apply to Attempted Murder*

"The business of 'transferring' the *mens rea* of a specific intent to kill from an intended victim to an unintended victim (or, more properly, simply applying it to the unintended victim) becomes far more complex when dealing with inchoate criminal homicides such as . . . attempted murder . . . ." (*Harvey v. State, supra,* 681 A.2d at p. 639.) Two California decisions have concluded that transferred intent does not apply to attempted murder. (*People v. Czahara* (1988) 203 Cal.App.3d 1468, 1471 [250 Cal.Rptr. 836] (*Czahara*); *People v. Calderon* (1991) 232 Cal.App.3d 930, 935 [283 Cal.Rptr. 833] (*Calderon*); see also *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 688 [60 Cal.Rptr.2d 761], citing *Czahara* with approval.) These cases disagreed with earlier decisions that assumed, without analysis, that transferred intent does apply to attempted murder. (*People v. Flores* (1986) 178 Cal.App.3d 74, 80-82 [223 Cal.Rptr. 465]; *People v. Neal* (1950) 97 Cal.App.2d 668, 672-673 [218 P.2d 556].)

In *Czahara,* the defendant shot at and injured two persons—Christie and Johnson—for which he was convicted of two attempted murders. The evidence suggested the defendant may have intended to kill Christie but not Johnson. The trial court instructed on transferred intent. The Court of Appeal found the instruction erroneous. It agreed with the authors of a leading treatise who "argue that [transferred intent] should not apply at all to *attempted* homicides, as the assailant can be punished directly for an attempt on the intended victim: 'If, without justification, excuse or mitigation D with intent to kill A fires a shot which misses A but unexpectedly inflicts a non-fatal injury upon B, D is guilty of an attempt to commit murder,—but

---

[4]This conclusion does not mean that a person is always liable for all deaths that result from an act with a malicious state of mind. As Justice Mosk noted in *Scott,* proximate causation is also required for each death. (*Scott, supra,* 14 Cal.4th at p. 556, fn. 1 (conc. opn. of Mosk, J.); see generally *People v. Cervantes* (2001) 26 Cal.4th 860 [111 Cal.Rptr.2d 148, 29 P.3d 225].)

the attempt was to murder A whom D was trying to kill and not B who was hit quite accidentally. And so far as the criminal law is concerned there is no transfer of this intent one to the other so as to make D guilty of an attempt to murder B.' " (*Czahara, supra,* 203 Cal.App.3d at p. 1474, quoting Perkins & Boyce, Criminal Law, *supra,* ch. 7, § 8, p. 925.) The court then applied this conclusion to its facts: "If Czahara aimed only at Christie, intending to kill only her, then he was attempting to kill only her. He was prosecuted and convicted of that attempt. There was no need to employ the legal fiction of transferred intent in order to fully punish him for the attempt. Again assuming that he had no intent to shoot Johnson, that shooting should be punished according to the culpability which the law assigns it, but no more." (*Czahara, supra,* 203 Cal.App.3d at p. 1475.) It summarized the rule: "[W]here a single act is alleged to be an attempt on two persons' lives, the intent to kill should be evaluated independently as to each victim, and the jury should not be instructed to transfer intent from one to another." (*Ibid.*)

In *Calderon,* the defendant shot at and intended to kill one person, but missed and hit instead a nearby child. The child survived. The defendant was convicted of attempting to murder both the intended target and, on a transferred intent theory, the child. The Court of Appeal followed *Czahara, supra,* 203 Cal.App.3d 1468, and concluded transferred intent does not apply. "The crime of attempted murder may be committed whether or not the intended victim is actually injured. Calderon therefore committed a completed crime against his intended victim which is as serious as the greatest level of culpability which could be achieved by transferring that intent to his unintended victim, obviating the need to apply the doctrine." (*Calderon, supra,* 232 Cal.App.3d at p. 936.)

We agree with these decisions. We explained above that intent to kill is not "used up" with the killing of the intended target but extends to every person actually killed. But this rationale does not apply to persons not killed. We see no suggestion the Legislature intended to extend liability for unintended victims to an inchoate crime like attempted murder. The crime of attempt sanctions what the person intended to do but did not accomplish, not unintended and unaccomplished potential consequences.

■ The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. (*People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666].) But over a century ago, we made clear that implied malice cannot support a conviction of an *attempt* to commit murder. " 'To constitute murder, the guilty person need not intend to take life; but to constitute an attempt to

murder, he must so intend.' [Citation.] 'The wrong-doer must specifically contemplate taking life; and though his act is such as, were it successful, would be murder, if in truth he does not mean to kill, he does not become guilty of an attempt to commit murder.' [Citation.]" (*People v. Mize* (1889) 80 Cal. 41, 43 [22 P. 80], quoted in *People v. Murtishaw* (1981) 29 Cal.3d 733, 764 [175 Cal.Rptr. 738, 631 P.2d 446]; see also *People v. Collie* (1981) 30 Cal.3d 43, 61-62 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].)

We should also distinguish between a completed murder and attempted murder regarding transferred intent. Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder—due to transferred intent—if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others.

The Maryland Court of Appeals has also considered this question and reached the same conclusion.[5] It drew an apt analogy between transferred intent and the felony-murder rule, which imposes murder liability for a death that occurs during the commission of certain felonies. (See generally *People v. Hansen* (1994) 9 Cal.4th 300, 308 [36 Cal.Rptr.2d 609, 885 P.2d 1022].) "Both doctrines [transferred intent and felony murder] are used to impose criminal liability for unintended deaths. [Citation.] Clearly, there is no crime of attempted felony murder when no death occurs during the course of a felony. [Citation.] Likewise, the doctrine of transferred intent does not apply to attempted murder when there is no death." (*Poe v. State, supra*, 671 A.2d at p. 504.)

In another case, it discussed yet another reason not to apply transferred intent to an inchoate crime like attempted murder. "A related reason why transferred intent cannot properly apply to attempted murder derives from the fact that the crime of attempted murder requires no physical injury to the

---

[5]Florida has also refused to extend transferred intent to attempted murder. (*Shellman v. State* (Fla.Dist.Ct.App. 1993) 620 So.2d 1010.) A Nevada case involving facts similar to this case does apply transferred intent to attempted murder. (*Ochoa v. State, supra*, 981 P.2d 1201.) The *Ochoa* court discussed and disagreed with *Birreuta, supra*, 162 Cal.App.3d 454, and concluded—as we do—that transferred intent "applies regardless of whether or not the intended victim was injured." (*Ochoa v. State, supra*, 981 P.2d at pp. 1204-1205.) It never discussed the separate question of whether transferred intent applies to attempted murder. For this reason, we find that decision unpersuasive. We also find unpersuasive a New Mexico intermediate appellate court decision predating *Czahara, supra*, 203 Cal.App.3d 1468, and *Calderon, supra*, 232 Cal.App.3d 930, that concluded transferred intent applies to attempted murder. (*State v. Gillette* (1985) 102 N.M. 695 [699 P.2d 626, 634-636].)

victim [a circumstance noted in *Calderon, supra,* 232 Cal.App.3d at p. 936]. . . . Assuming an attempted murder scenario where the defendant fires a shot at an intended victim and no bystanders are physically injured, one sees that it is virtually impossible to decide to whom the defendant's intent should be transferred. Is the intent to murder transferred to everyone in proximity to the path of the bullet? Is the intent transferred to everyone frightened and thereby assaulted by the shot? There is no rational method for deciding how the defendant's intent to murder should be transferred." (*Ford v. State, supra,* 625 A.2d at p. 1000.)

This concern is real. The world contains many people a murderous assailant does not intend to kill. Obviously, intent to kill one person cannot transfer to the entire world. But how can a jury rationally decide which of many persons the defendant did not intend to kill were attempted murder victims on a transferred intent theory? To how many unintended persons can an intent to kill be transferred? Just as acts with implied malice constitute murder of anyone actually killed, but not attempted murder of others, so, too, acts with the intent to kill one person constitute murder of anyone actually killed, but not attempted murder of others.

The conclusion that transferred intent does not apply to attempted murder still permits a person who shoots at a group of people to be punished for the actions towards everyone in the group even if that person primarily targeted only one of them. As to the nontargeted members of the group, the defendant might be guilty of crimes such as assault with a deadly weapon or firing at an occupied vehicle. (See *Czahara, supra,* 203 Cal.App.3d at p. 1475.) More importantly, the person might still be guilty of attempted murder of everyone in the group, although not on a transferred intent theory. The *Ford* court discussed this last point in explaining why one of its earlier cases (*State v. Wilson* (1988) 313 Md. 600 [546 A.2d 1041]) correctly affirmed attempted murder convictions even though it erred in relying on transferred intent. "The result in *Wilson* can best be explained and justified by distinguishing between transferred intent and what is essentially concurrent intent." (*Ford v. State, supra,* 625 A.2d at p. 1000.)

The *Ford* court explained that although the intent to kill a primary target does not *transfer* to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the "kill zone." "The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane

intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a 'kill zone' to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone. This situation is distinct from the 'depraved heart' [i.e., implied malice] situation because the trier of fact may infer the actual intent to kill which is lacking in a 'depraved heart' [implied malice] scenario." (*Ford v. State, supra,* 625 A.2d at pp. 1000-1001, fn. omitted.)

California cases that have affirmed convictions requiring the intent to kill persons other than the primary target can be considered "kill zone" cases even though they do not employ that term. In *People v. Vang* (2001) 87 Cal.App.4th 554, 563-565 [104 Cal.Rptr.2d 704], for example, the defendants shot at two occupied houses. The Court of Appeal affirmed attempted murder charges as to everyone in both houses—11 counts—even though the defendants may have targeted only one person at each house. "The jury drew a reasonable inference, in light of the placement of the shots, the number of shots, and the use of high-powered, wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residences they shot up. . . . The fact they could not see all of their victims did not somehow negate their express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed." (*Id.* at pp. 563-564; see also *People v. Gaither* (1959) 173 Cal.App.2d 662, 666-667 [343 P.2d 799] [defendant mailed poisoned candy to his wife; convictions for administering poison with intent to kill affirmed as to others who lived at the residence even if not a primary target].)

This case permits—virtually compels—a similar inference. Even if the jury found that defendant primarily wanted to kill Wilson rather than Wilson's passengers, it could reasonably also have found a *concurrent* intent to

kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone. Such a finding fully supports attempted murder convictions as to the passengers.[6]

The Attorney General argues that not applying transferred intent here would create an anomaly. He notes that, under *Scott, supra,* 14 Cal.4th 544, a defendant who shoots at two persons and misses the intended target but kills an unintended victim may be guilty of murder and attempted murder. It would be anomalous, he urges, to conclude that a person who instead kills the intended target is guilty only of murder and, at most, assault as to the unintended victim. "Paradoxically," he argues, this result would "reward the defendant with good aim and punish the one with bad aim, despite the fact that in both scenarios the defendant acted with the exact same mental state: the intent to kill his intended victim, and his actions resulted in the same harm." We disagree that any anomaly exists. When one attempts to kill one person but instead kills another, there are always two victims: the intended target and the one actually killed. But when one kills the intended target, the situation may be different. One victim—the dead intended target—clearly exists, but whether a second victim also exists may be less clear. As discussed above, the defendant may be convicted of the attempted murders of any within the kill zone, although on a concurrent, not transferred, intent theory. Persons not within the kill zone are not necessarily victims in the same sense as the intended target of a shooting that kills the wrong person. Convicting the defendant of a crime other than attempted murder, or no crime at all, as to unintended targets who are neither killed nor within the kill zone creates no anomaly.

For these reasons, we conclude that the doctrine of transferred intent does not apply to attempted murder. Defendant's guilt of attempted murder must be judged separately as to each alleged victim.[7]

### 3. *The Law Applied to This Case*

In this case, defendant's intent to kill Wilson does not transfer to Morgan or Simon. This is so, not because defendant killed his intended target, but because transferred intent does not apply to attempted murder. Whether defendant is guilty of attempted premeditated murder of Morgan or

---

[6]This concurrent intent theory is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent. Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.

[7]We express no opinion regarding the application of transferred intent to a crime, such as battery, that is not inchoate and does not involve a homicide. (See, e.g., *State v. Stringfield* (1980) 4 Kan.App.2d 559 [608 P.2d 1041] [transferred intent applies to aggravated battery].)

Simon depends on his mental state as to them, not on his mental state as to Wilson. We must now decide whether the court correctly instructed the jury on this law. "Once we have ascertained the relevant law, we determine the meaning of the instructions in this regard. Here the question is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts." (*People v. Kelly* (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

The majority below reversed the attempted murder convictions. It concluded that the trial court, "by referring to the instruction on transferred intent in its reply [to the jury question], led the jury to believe that a finding of premeditation as to the killing of Wilson could be transferred to the wounding of Morgan and Simon." Justice Ortega dissented. He noted that CALJIC No. 8.65 says only that when a person attempts to kill one person, "but by mistake or inadvertence *kills* a different person," the crime is the same as if the intended target had been killed. (Italics added.) He argued that this instruction "could not have been applied by the jury to transfer intent from Wilson to either Morgan or Simon." Rather its language transferred intent only to a person actually killed. "The instruction," he argued, "is not one the jury would have had any trouble understanding. It is short, to the point, and uses simple words. I find no possibility the jury could have misapplied the instruction to nonfatal injuries. The instruction uses the words 'kill,' 'kills,' and 'killed,' and says nothing about injuries." Justice Ortega also argued that, given the strength of the evidence, a jury could not "rationally conclude that defendant did not intend to kill everyone in the car. He was at point-blank range firing at and hitting helpless people. He could not, while using such lethal force, have intended to merely 'wing' them or otherwise inflict some sort of nonfatal injury." We agree with the dissent.

CALJIC No. 8.65, as the court gave it, refers to a mistaken killing, but not to injuries. Although labeled the "transferred intent" instruction, it does not actually use that term. It merely tells the jury, correctly, that if the defendant killed the wrong person, the *killing* constituted the same crime as if the intended person had been killed. It directly related to this case and properly informed the jury it did not have to determine who, exactly, defendant intended to kill in order to find him guilty of murder. But it did not go further. It did not allow the jury to transfer intent to someone who is only injured.

In *Czahara, supra,* 203 Cal.App.3d at page 1472, which found prejudicial instructional error, the trial court modified CALJIC No. 8.65, and told the jury: "When one attempts to kill a certain person, but by mistake or inadvertence *injures* a different person, the crime, if any, so committed is the

same as though the person originally intended to be killed had been *injured.*" (Italics added to indicate modification.) Here, the court committed no such error. It did not modify CALJIC No. 8.65 to extend its coverage to a person merely injured.

The district attorney's argument to the jury, unlike the later instruction, did suggest the jury could transfer intent to the attempted murder counts. But any uncertainty in this regard was dispelled when, during deliberations, the jury specifically asked whether its finding on premeditation as to Wilson would "follow over" to the attempted murder charge as to Morgan. The court responded, again correctly, that the jury had to "make a determination specifically as to each count, whether you find willful, malicious, premeditation, if you find those as to each count. You make a separate finding. [¶] . . . One does not necessarily lead and follow to the other. You have to look at each count separately." After conferring with the parties, the court additionally referred the jury to the relevant instructions, including CALJIC No. 8.65, and reiterated that "each count is determined separately one from another. So a finding on one does not necessarily lead to a finding on another."

The question the jury asked the court, and the foreperson's statements, showed the jury was conscientiously parsing the precise language of the instructions which, in this case, did *not* transfer intent to a person merely injured. No reason appears to believe this jury would have misread the instruction's simple language as saying what it did not say. The court also correctly answered the jury's specific question on this point. Accordingly, we see no reasonable likelihood that the jury understood the charge as permitting it to transfer intent to kill to a person merely injured. Moreover, we agree with Justice Ortega that the evidence here virtually compelled a finding that, even if defendant primarily wanted to kill Wilson, he also, concurrently, intended to kill the others in the car. At the least, he intended to create a kill zone. Contrary to the dissent, we conclude that giving instructions that correctly state the law relating to the case was not prejudicial error.[8]

B. *Proximate Causation*

 Section 12022.53(d) enhances the sentence of anyone who, in the commission of specified felonies including murder and attempted murder

---

[8]Although we find the jury did not misunderstand the instructions in this case, in future cases involving both murder and attempted murder (or manslaughter) charges, it might be better for the court specifically to clarify that transferred intent does not apply to the attempt charges.

(Pen. Code, § 12022.53, subd. (a)(1), (18)), "intentionally and personally discharged a firearm and proximately caused great bodily injury, as defined in [Penal Code] Section 12022.7, or death, to any person other than an accomplice . . . ." The jury found this enhancement true as to the murder and attempted murder charges. The trial court instructed the jury on these statutory elements, but it did not define the term "proximately caused."[9] Defendant argues that the trial court had a sua sponte duty to define proximate causation for the jury, and that its failure to do so was prejudicial. The majority below agreed. Noting that the "evidence was not clear as to which of the two, defendant or his cohort, fired the shots that hit each of the three victims," it concluded that "without a proper definition of proximate cause, the jury could have found the enhancement true without determining that a bullet fired by defendant struck a victim." Justice Ortega dissented.

The Attorney General argues the trial court had no sua sponte duty to define proximate causation. We disagree. The court instructed the jury in terms of the statute, which is appropriate if the jury would have no difficulty understanding the statute without guidance. (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197].) ■ A court has no sua sponte duty to define terms that are commonly understood by those familiar with the English language, but it does have a duty to define terms that have a technical meaning peculiar to the law. (*Ibid.*; *People v. Mayfield* (1997) 14 Cal.4th 668, 773 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "[T]erms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance." (*People v. Estrada, supra,* 11 Cal.4th at pp. 574-575, citing *People v. Richie* (1994) 28 Cal.App.4th 1347, 1360 [34 Cal.Rptr.2d 200].)

Even courts and the legal community have struggled with the meaning of proximate causation. "The misunderstanding engendered by the term 'proximate cause' has been documented." (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1051 [1 Cal.Rptr.2d 913, 819 P.2d 872].) "It is reasonably likely that when jurors hear the term 'proximate cause' they may misunderstand its meaning . . . ." (*Id.* at p. 1050.) In *Mitchell,* we disapproved the then standard instruction on proximate causation in civil cases. (*Id.* at pp. 1050-1054.) We have since found that the earlier instruction's "infirmity is equally great in criminal cases." (*People v. Roberts* (1992) 2 Cal.4th 271, 313 [6

---

[9]The court instructed: "If you find the defendant guilty of murder [or] attempted murder . . . , you must determine whether the defendant intentionally and personally discharged a firearm and proximately caused death, or great bodily injury, as defined in Penal Code section 12022.7 [which the court defined earlier] to Kenneth Wilson, Leon Simon and Skylar Morgan."

Cal.Rptr.2d 276, 826 P.2d 274].) CALJIC No. 3.40, the standard criminal law instruction on causation, has since been modified to reflect these decisions. (See *People v. Temple* (1993) 19 Cal.App.4th 1750, 1754-1756 [24 Cal.Rptr.2d 228].) ▮ These decisions make clear that proximate causation *does* have a meaning peculiar to the law, and that a jury would have difficulty understanding its meaning without guidance. We thus conclude the court erred in not defining proximate causation.

▮ To determine whether the error was prejudicial we must decide what instruction the court should have given. CALJIC No. 17.19.5 (2002 rev.) (6th ed. 1996) is the current standard instruction regarding the section 12022.53(d) enhancement, although it did not exist at the time of trial here. It defines proximate causation in terms substantially identical to CALJIC No. 3.40 but adapted to the provisions of section 12022.53(d): "A proximate cause of great bodily injury or death is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the great bodily injury or death and without which the great bodily injury or death would not have occurred." (Brackets omitted.) The Use Note to CALJIC No. 17.19.5, *supra*, states, "If there is more than one cause of the bodily injury or death, CALJIC 3.41 should also be given." CALJIC No. 3.41, in turn, as adapted to the provisions of section 12022.53(d), provides: "There may be more than one cause of the [great bodily injury or death]. When the conduct of two or more persons contributes concurrently as a cause of the [great bodily injury or death], the conduct of each is a cause of the [great bodily injury or death] if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the [great bodily injury or death] and acted with another cause to produce the [great bodily injury or death]. [¶] [If you find that the defendant's conduct was a cause of [great bodily injury or death] to another person, then it is no defense that the conduct of some other person [, even the [injured] [deceased] person,] contributed to the [great bodily injury or death].]" (Bracketed references to "great bodily injury or death" added to adapt the instruction to § 12022.53(d); other brackets in original.)

The Court of Appeal found CALJIC No. 17.19.5 "is not a proper definition of proximate cause. That instruction would permit a true finding on the enhancement based [on] the cohort's inflicting the death and injuries and defendant's aiding and abetting him simply by also firing a gun. The enhancement cannot be found true unless defendant personally fired the bullets which struck the victim. We note that the Attorney General does not contend otherwise." The Attorney General contends in this court that CALJIC No. 17.19.5 correctly states the law. He argues that "proximately

caus[ing]" injury or death is different from *personally* inflicting the injury or death, and that defendant could indeed proximately cause injury or death even if his own bullets did not hit anyone.

Citing the Court of Appeal's statement that "the Attorney General does not contend otherwise" and California Rules of Court, rule 29(b),[10] defendant claims that the Attorney General is precluded from making this argument because he did not make it in the Court of Appeal. We disagree. In the Court of Appeal, defendant neither criticized CALJIC No. 17.19.5 nor argued that section 12022.53(d) requires the defendant to personally fire the bullets that inflict the harm. The Court of Appeal opinion interjected the point for the first time. Therefore, until the opinion was filed, the Attorney General had no reason to argue it either way. An argument responsive only to a point the Court of Appeal raised for the first time in its opinion is not an "issue that could have been . . . raised in the briefs filed in the Court of Appeal" within the meaning of California Rules of Court, rule 29(b). The Attorney General is entitled to argue in this court that the Court of Appeal's legal conclusion is incorrect.

We believe that CALJIC No. 17.19.5 does correctly define proximate causation. Section 12022.53(d) requires that the defendant "intentionally and *personally* discharged a firearm" (italics added), but only that he "proximately caused" the great bodily injury or death. The jury, properly instructed, reasonably found that defendant did personally discharge a firearm. The statute states nothing else that defendant must *personally* do. Proximately causing and personally inflicting harm are two different things. The Legislature is aware of the difference. When it wants to require personal infliction, it says so. (E.g., Pen. Code, § 12022.7, subd. (a) [imposing a sentence enhancement on a person who "personally inflicts great bodily injury"].) When it wants to require something else, such as proximate causation, it says so, as in section 12022.53(d).

The Court of Appeal considered a similar question in *People v. Rodriguez* (1999) 69 Cal.App.4th 341 [81 Cal.Rptr.2d 567]. In *Rodriguez*, the prosecution alleged that a certain prior conviction was a serious felony under Penal Code section 1192.7, subdivision (c)(8), i.e., that it was a felony in which the defendant "personally inflict[ed]" great bodily injury. The prior conviction, however, was of a crime that only required that the defendant's actions "proximately cause[d]" death or serious bodily injury. (Pen. Code, § 148.10; see *People v. Rodriguez, supra,* at pp. 345-346.) The trial court instructed the

---

[10]As relevant, that rule provides: "As a matter of policy, on petition for review the Supreme Court normally will not consider: [¶] (1) any issue that could have been but was not timely raised in the briefs filed in the Court of Appeal." (Cal. Rules of Court, rule 29(b).)

jury in terms of proximate causation under CALJIC No. 3.40, and the jury found the prior conviction was serious. The Court of Appeal reversed. It concluded, "Proximately causing an injury is clearly different from personally inflicting an injury." (*People v. Rodriguez, supra,* at p. 351.) "To 'personally inflict' an injury is to directly cause an injury, not just to proximately cause it. The instruction was wrong because it allowed the jury to find against Rodriguez if the . . . injury was a 'direct, natural and probable consequence' of Rodriguez's action, even if Rodriguez did not personally inflict the injury." (*Id.* at pp. 347-348.)

The *Rodriguez* court discussed *People v. Cole* (1982) 31 Cal.3d 568 [183 Cal.Rptr. 350, 645 P.2d 1182], which construed Penal Code section 12022.7's requirement that the defendant "personally inflict[] great bodily injury." "*Cole* illustrates that the term 'personally inflict' has a distinct meaning and that its use in a statute signifies a legislative intent to punish only the actor who directly inflicts an injury. . . . We think it obvious that *an individual can and often does proximately cause injury without personally inflicting that injury*. For instance, as noted in *Cole,* an aider and abettor of a crime can commit a direct act—affirmatively blocking a victim's exit— which proximately causes injury, but does not constitute personal infliction of an injury. (*Cole, supra,* 31 Cal.3d at p. 571.)" (*People v. Rodriguez, supra,* 69 Cal.App.4th at pp. 348-349, italics added.) The court contrasted the term "personally inflicts" with the language the Legislature used in section 12022.53(d). " ' "It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded." ' [Citation.] To illustrate, the Legislature included 'proximate cause' in [Penal Code] section 12022.53 . . . . However, the Legislature did not employ the proximate cause concept when it articulated the requirements for enhancement under [Penal Code] section 12022.7, but instead used the language 'personally inflicts great bodily injury.' ([Pen. Code,] § 12022.7, subd. (a).) . . . . We decline to impute the proximate cause concept into the statute when the Legislature left it out." (*People v. Rodriguez, supra,* at pp. 349-350.)

The Court of Appeal here erred in the reverse way. It imputed the personal infliction "concept into a statute when the Legislature left it out." (*People v. Rodriguez, supra,* 69 Cal.App.4th at p. 350.) A person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet. For example, in *People v. Sanchez, supra,* 26 Cal.4th 834, two persons engaged in a gun battle, killing an innocent bystander. Who fired the fatal bullet, and thus who personally inflicted the harm, was unknown, but we held that the jury could find that *both* gunmen proximately caused the death. (*Id.* at pp. 848-849.) The same is true here. If defendant did

not fire the bullets that hit the victims, he did not *personally inflict*, but he may have *proximately caused*, the harm. CALJIC Nos. 3.40 and 3.41, and hence 17.19.5, correctly define proximate causation. (*People v. Sanchez, supra*, 26 Cal.4th at p. 845; *People v. Cervantes, supra*, 26 Cal.4th at pp. 866-867.) Accordingly, the trial court should have given an instruction like CALJIC No. 3.40 and, because the evidence suggested more than one cause, No. 3.41 (today CALJIC No. 17.19.5, augmented, when the evidence suggests more than one cause, by CALJIC No. 3.41).

We also conclude, however, that the error was harmless under any standard. The majority below reversed the enhancement findings because the jury might have found the enhancement true without finding that defendant fired a bullet that struck a victim. However, as we have seen, section 12022.53(d) does not require that the defendant fire a bullet that directly inflicts the harm. The enhancement applies so long as defendant's personal discharge of a firearm was a proximate, i.e., a substantial, factor contributing to the result.

As noted above, we stated in *Mitchell v. Gonzales, supra*, 54 Cal.3d at page 1050, that jurors hearing the term "proximate cause" may "misunderstand its meaning . . . ." To complete what we said there, jurors "may misunderstand its meaning or improperly *limit* their discussion of what constitutes a cause in fact." (*Ibid.*, italics added.) However, jurors who improperly *limit* their discussion of what constitutes proximate cause will not find causation where it does not exist. The correct definition of proximate causation is *broader*, not narrower, than jurors might assume. In a criminal case, we noted that "in *Mitchell* we criticized the [former proximate cause instruction] as placing undue emphasis on physical or temporal nearness. [Citation.] Thus, . . . any such confusion on the jury's part could only benefit defendant." (*People v. Roberts, supra*, 2 Cal.4th at p. 313; see also *People v. Catlin* (2001) 26 Cal.4th 81, 157 [109 Cal.Rptr.2d 31, 26 P.3d 357] [citing this language with approval].) On the facts of this case, the jury could not have misunderstood the term "proximate cause" in a way that would have prejudiced defendant, i.e., that would have resulted in a finding of proximate causation on an improper basis.

In arguing to the contrary, the dissent contends the jury may have found that the cohort fired his gun first and inflicted the injuries. Assuming that the evidence supported such findings and that those circumstances would prevent a true finding on the enhancement (cf. *In re Sergio R.* (1991) 228 Cal.App.3d 588, 601-602 [279 Cal.Rptr. 149]), we still see no prejudice. Even if the jurors did not know exactly what proximate causation means, no juror who is conversant in the English language would find that discharging a firearm proximately caused injuries that had already occurred.

### III. Conclusion

We reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with this opinion.

George, C. J., Baxter, J., Werdegar, J., and Brown, J., concurred.

**KENNARD, J.,** Dissenting.—Unlike the majority, I am of the view that the trial court's failure to properly instruct the jury on the scope of the transferred intent doctrine prejudiced defendant. Nor do I agree that the trial court's failure to define the term "proximate cause" in connection with the sentence enhancement for "proximately" causing great bodily injury or death was harmless error.

### I

Skylar Morgan and Leon Simon, neither of whom was a gang member, testified that on the night of March 6, 1999, they were in Long Beach in a car driven by Kenneth "Kebo" Wilson, a member of the Rolling 20's Crips street gang. Wilson stopped the car to talk to defendant and another man, both members of the Insane Crips, a rival gang. When defendant asked Wilson if he was "Kebo," Wilson replied he was, adding that his passengers were not gang members. He said he would drop off his passengers and return. Saying, "So you Kebo from 20's," defendant opened fire. As Wilson started to drive away, defendant and his companion fired at the car. Wilson was killed; his passengers, Morgan and Simon, were wounded.

According to Morgan and Simon, it was defendant who started shooting. In a tape-recorded statement to the police that was played to the jury, defendant said his companion, Patrick LeBeau, fired the first shots, after which defendant "just started shooting, too" because LeBeau was his "home boy." The evidence does not show who fired the shots that hit Wilson, Morgan, and Simon.

Long Beach Police Officer Paul Edwards found a loaded gun on the floor of Wilson's car between the driver's seat and the door. The gun was inoperable.

A jury convicted defendant of the murder of Wilson and the attempted murders of Morgan and Simon. As to each count the jury found true a sentence enhancement allegation that defendant had fired a gun and "proximately" caused great bodily injury or death. (Pen. Code, § 12022.53, subd. (d).)

The Court of Appeal reversed the attempted murder convictions, based on its conclusion that the trial court had misinstructed the jury on transferred intent. It also reversed the sentence enhancement findings because of the trial court's failure to define proximate causation, an element of the enhancement.

## II

In his closing statement, the prosecutor argued that defendant fired at the victims' car with a premeditated intent to kill passengers Morgan and Simon, but he also argued that even if defendant intended to kill only driver Wilson, the jury could, by applying the doctrine of transferred intent, convict defendant of attempting to kill Morgan and Simon. In his words, "the intent . . . follows the bullet; wherever you are pointing it, that's where it goes."

When defense counsel argued there was no evidence that defendant intended to kill Morgan and Simon, the prosecutor told the jury in rebuttal: "[O]ne of the instructions talks about that, it is the concept of transfer [sic] intent. You don't get a benefit if you try to kill one person and inadvertently kill another, that that was not your intent. An attempt follows the bullets, kills a different person, the crime so committed is the same as though you originally had given that intended target. The law does not excuse bad marksmanship or hitting other people. [Defendant] is responsible for each of those acts."

After closing argument, the prosecutor asked the trial court to give the jury CALJIC No. 8.65, the standard instruction on transferred intent. He gave this reason: "[T]he argument of the defense was basically he didn't necessarily intend to shoot the other people [Morgan and Simon]. And I felt it necessary to respond to that with transfer [sic] intent." The trial court then instructed the jury, "When one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed."

During deliberations, the jury asked the trial court whether a finding of premeditation as to the murder of Wilson would "follow over" to the attempted murder of Morgan. The court responded that the jury had to make a separate determination whether, as to each count, defendant's acts were willful, malicious, and premeditated. The prosecutor then asked the trial court to direct the jury to consider CALJIC Nos. 8.65 (transferred intent), 8.66 (defining attempted murder) and 8.67 (defining attempted premeditated murder). The court did so, telling the jury: "I will refer you to three jury

instructions that may assist you in reaching a determination. One is 8.65, the other is 8.66, and the third is 8.67. . . . If you wish to take a look at those, it may be helpful. [¶] With respect to each count, each count is determined separately from one another. So a finding on one does not necessarily lead to a finding on another. It may assist."

The majority correctly holds that the doctrine of transferred intent does *not* apply to a charge of *attempted* murder. Thus, if defendant here had acted with a premeditated intent to kill Wilson, but as to Morgan and Simon lacked premeditation or intent to kill, he could not be convicted of the charges of attempted premeditated murder. Nevertheless, the majority concludes that the trial court did not err in giving CALJIC No. 8.65, the instruction on transferred intent. The majority reasons that the instruction discussed only what the jury should do if it were to find that in trying to kill one person, the defendant *killed* another. This leads the majority to conclude that the jury must have assumed that the instruction pertained only to the charge that defendant *murdered* Wilson, a crime to which the transferred intent doctrine applies,[1] and that the jury did not apply the instruction to the charges of *attempted* murder because victims Morgan and Simon were not killed.

The majority's reasoning is unsound for three reasons.

First, the prosecutor believed that CALJIC No. 8.65, the instruction on transferred intent, applied not only to murder but also to attempted murder: He specifically asked the trial court to give the instruction to counter the defense argument that defendant should not be convicted of *attempted* murder because he lacked the intent to kill Morgan and Simon. If the prosecutor, a professional trained and experienced in criminal law, incorrectly believed that the instruction applied to attempted murder, it is difficult to fathom the majority's conclusion that a jury of lay individuals would correctly apply to the facts in this case the complex legal principles contained in the instruction on transferred intent.

Second, although the majority is right that the instruction on transferred intent applies to a charge of murder, here the *facts* did not warrant applying the instruction to the murder of Wilson. To apply the instruction to the Wilson murder, the jury would have had to believe that defendant intended to kill Morgan and Simon, who were wounded, but that he did *not* intend to

---

[1] English courts have applied the transferred intent doctrine to murder for over four centuries. (See *The Queen v. Saunders & Archer* (1576) 75 Eng.Rep. 706, 708.) For almost a century, this court has consistently held that the doctrine applies to California's murder statute. (See *People v. Scott* (1996) 14 Cal.4th 544, 549-550 [59 Cal.Rptr.2d 178, 927 P.2d 288]; *People v. Suesser* (1904) 142 Cal. 354, 366 [75 P. 1093].)

kill Wilson, who died from gunshot wounds. The evidence, however, was just the opposite, suggesting that defendant wanted to kill Wilson, a member of a rival gang, but not Morgan and Simon, who did not belong to any gang.

Third, in closing argument the prosecutor did not ask the jury to apply the instruction on transferred intent to the charge of *murder* of Wilson. Instead, he argued that it applied to the two counts of *attempted* murder when responding to the defense argument that defendant was not guilty of those charges because he did not intend to kill Wilson's two passengers, Morgan and Simon.

That the jury must have applied the doctrine of transferred intent to the charges of *attempted* murder follows from its question to the trial court, during deliberations, whether a finding of *premeditation* as to the murdered Wilson would "follow over" to the wounded Morgan. One can reasonably conclude that the jury did not inquire about defendant's *intent to kill* Wilson, because it believed it already knew the answer: that under CALJIC No. 8.65, it could transfer that intent to Morgan and Simon, the two alleged victims of *attempted* murder.

The trial court's directive to the jury to reread CALJIC No. 8.65, the instruction on transferred intent, must have reinforced, albeit erroneously so, the jury's belief that it should apply that instruction to the charges of *attempted* murder, as the prosecutor, in closing argument, had asked the jury to do.

The trial court's instruction on the doctrine of transferred intent was ambiguous. Not at all clear was whether it applied only to the charge of *murder* of Wilson, or whether it also applied to the *attempted* murder charges pertaining to the injured Morgan and Simon. When a trial court's instructions are ambiguous, a reviewing court must determine whether there is "a reasonable likelihood that the jury misconstrued or misapplied the words" of the instruction. (*People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) In this case, for the reasons given above, it is a virtual certainty that the jury misapplied CALJIC No. 8.65, the instruction on transferred intent, to the charges of *attempted* murder.

The majority cursorily concludes that any instructional error was harmless because "the evidence here virtually compelled a finding that, even if defendant primarily wanted to kill Wilson, he also, concurrently, intended to kill the others in the car" because he "intended to create a kill zone." (Maj. opn., *ante,* at p. 333.) Not so. Defendant had a motive to kill Wilson because he knew the latter to be a member of a rival gang, but Wilson's two

passengers, Morgan and Simon, were not gang members and Wilson said so to defendant; the prosecution offered no evidence that defendant had any motive to kill the two passengers. Although the jury certainly *could* have concluded that defendant intended to kill all of the occupants in the car, I cannot say "beyond a reasonable doubt" (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]) that the jury would *necessarily* have reached such a conclusion.

## III

Subdivision (d) of Penal Code section 12022.53 provides that any defendant who, in the commission of specified felonies, "intentionally and personally discharged a firearm and *proximately* caused great bodily injury . . . or death, to any person other than an accomplice" (italics added) must be sentenced to a term of 25 years to life in prison. The trial court here instructed the jury on this sentence enhancement but did not define the term "proximately" for the jury. I disagree with the majority that the trial court's failure to do so was harmless error.

In support of its conclusion, the majority quotes this statement by a majority of this court in *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1050 [1 Cal.Rptr.2d 913, 819 P.2d 872]: "It is reasonably likely that when jurors hear the term 'proximate cause' they may misunderstand its meaning or improperly limit their discussion of what constitutes a cause in fact."[2] Seizing on the last half of this statement, the majority observes that if the trial court's failure to define proximate cause caused the jury to "improperly limit" (*Mitchell,* at p. 1050) the scope of proximate cause, defendant could not have been injured. The majority explains: "[J]urors who improperly *limit* their discussion of what constitutes proximate cause will not find causation where it does not exist. The correct definition of proximate causation is *broader,* not narrower, than jurors might assume." (Maj. opn., *ante,* at p. 338.) I agree with the majority that if the jury thought proximate cause had a more limited meaning than the correct definition of that term, the trial court's failure to define it did not prejudice defendant. But, as I shall explain, that is not the only way in which the jury may have misconstrued the meaning of proximate cause.

In *Mitchell,* this court described an experiment, conducted as part of "a scholarly study of 14 jury instructions," in which " 'the term "proximate

---

[2]In *Mitchell,* I disagreed with the majority's disapproval of BAJI No. 3.75, a standard jury instruction defining proximate cause. (See *Mitchell v. Gonzales, supra,* 54 Cal.3d at pp. 1056-1062 (dis. opn. of Kennard, J.).) The majority's observation there that jurors are likely to misunderstand the term "proximate cause" unless its meaning is defined for them was not a point of disagreement.

cause" was misunderstood by 23% of the subjects,'" who thought it meant "' "approximate cause," "estimated cause," or some fabrication.'" (*Mitchell v. Gonzales, supra,* 54 Cal.3d at p. 1051.) The words "approximate" and "estimated" both imply a level of certainty that is less than the "beyond a reasonable doubt" standard required in criminal cases. Like the subjects in the just described experiment, the jury here may have similarly misunderstood the word "proximately."

CALJIC No. 17.19.5 (2002 rev.) (6th ed. 1996) correctly defines a proximate cause of great bodily injury or death as "an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the great bodily injury or death and without which the great bodily injury or death would not have occurred." That is how the trial court in this case should have instructed the jury. If the jury had been so instructed, could it have had a reasonable doubt as to whether defendant "proximately" caused not only Wilson's death but also the injuries to Morgan and Simon? The answer is "yes."

If defendant did fire the bullets that struck the three victims, it necessarily follows that he "proximately caused great bodily injury . . . or death." (Pen. Code, § 12022.53, subd. (d).) But both defendant and his companion fired shots, and the evidence does not show whose shots caused the injuries. Thus, the jury could not have found beyond a reasonable doubt that defendant shot the three victims. Even if defendant's accomplice was the one who shot them, defendant proximately caused their injuries if he "set[] in motion a chain of events" that as a "direct, natural and probable consequence," led to the shooting. (CALJIC No. 17.19.5.) That scenario would have required defendant to shoot first, with his accomplice following suit. It is not at all clear, however, who fired first. Morton and Simon testified it was defendant. But defendant, in a tape-recorded statement to the police that was played at trial, claimed it was his companion who began the shooting and defendant then joined him in support. Under this scenario, if the accomplice's bullets rather than defendant's struck the three victims, defendant did not proximately cause their injuries, because the accomplice started shooting on his own initiative, not in response to an act by defendant.

Because of these conflicting accounts, the jury may have been uncertain who fired first and whose shots hit Wilson, Morton, and Simon. Given that uncertainty, the jury, had it been properly instructed on the meaning of proximate cause, might well have decided that it could not find beyond a reasonable doubt that defendant proximately caused great bodily injury or death to the three victims. Thus, the trial court's failure to define that term was prejudicial error. (See *Chapman v. California, supra,* 386 U.S. 18, 24 [87 S.Ct. 824, 828].)

## IV

For the reasons given above, I would affirm the judgment of the Court of Appeal, which reversed defendant's convictions for attempting to murder Morgan and Simon and also reversed the sentence enhancements for use of a firearm that proximately caused the death of Wilson as well as the injuries to Morgan and Simon.

Moreno, J., concurred.