Filed 1/28/14  P. v. Pena CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B246900 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA391840) |
| v. | |
| RONALD PENA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Craig J. Mitchell, Judge.  Reversed in part, affirmed in part, and remanded for further proceedings.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Keith H. Borjon, Supervising Deputy Attorney General, and Joseph P. Lee, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Ronald Pena appeals from the judgment entered following a jury trial in which he was convicted of three counts of attempted murder, three counts of assault with a firearm, and a single count of possession of a firearm by a felon. Defendant admitted an allegation that he had suffered a prior serious or violent felony conviction within the scope of the "Three Strikes" law (Pen. Code, § 667, subds. (b)–(i)) and was sentenced to a second strike term.[1] Although he was not asked to admit the allegation, defendant's sentence included a prior serious felony enhancement pursuant to section 667, subdivision (a)(1).

Defendant contends the trial court erred by denying his motion for a judgment of acquittal at the close of the prosecution's case-in-chief with respect to one of the three counts of attempted murder. We conclude one of defendant's attempted murder convictions must be reversed because the evidence at the close of the prosecution's case-in-chief was insufficient to show that defendant specifically intended to kill more than two people. Thus the trial court should have granted defendant's motion for acquittal with respect to one of the attempted murder counts.

Defendant further contends that he was not advised of his rights before admitting the second strike allegation (§ 667, subd. (b)–(i)) or the prior serious felony enhancement allegation (§ 667, subd. (a)). The Attorney General concedes this point. We further note that the trial court only asked defendant to admit the strike allegation, not the prior serious felony enhancement allegation (§ 667, subd. (a)(1))and the prosecutor offered no proof of that enhancement allegation.

## BACKGROUND

### 1. The prosecution's case-in-chief

### a. The shooting and arrest

On the night of December 14, 2011, at about 9 p.m., 14-year-old Allan C., his 15-year-old brother Luis C., and their friend Angel N. were walking towards Santa Monica

---

[1] Undesignated statutory references pertain to the Penal Code.

and Western. All three boys were members of the Mara Salvatrucha (MS13) gang, and were within territory claimed by their gang. At the same time, the 29-year-old defendant was walking down the same sidewalk in the opposite direction.

As defendant passed the boys, he said "Fuck Mierdas" (an insult to the MS13 gang) and displayed a gun in his waistband. Luis told defendant he was "stupid" because the "police is right there." Defendant walked away. The boys began following defendant at a distance. Luis admitted at trial he was making gang hand signs.

Defendant suddenly turned and fired two shots toward the boys, who were 40 to 50 feet away. No one was struck. Luis testified that when defendant shot, the three boys were alongside one another, each about an arm's length from the next. Allan testified that Angel was about five feet behind them. Luis thought defendant was shooting at him. Allan testified the gun was pointed at him and Luis.

The boys ran away from defendant and toward several Los Angeles Police Department (LAPD) officers, including gang officers, who had been conducting a traffic stop and had heard the shots. The officers checked to see if the boys were armed and asked them what happened. All three boys pointed down the street and told the officers that "he" or "that guy" shot at them. Angel described defendant's clothing. The officers looked in the direction the boys pointed and saw defendant walking along Western.

The officers drove toward defendant, who ran across the street, then slowed to a fast-paced walk. The officers saw defendant toss a handgun into some bushes. An infrared scanner in a police helicopter indicated that the gun was hot. The officers detained defendant and recovered the handgun, which was a revolver containing two spent casings and one live round. Defendant wore a black glove on his right hand only.

Allan and Luis separately identified defendant at a field show-up. Each told officers that defendant was the man who fired shots toward them.[2]

_____

[2] The record does not indicate whether Angel identified defendant.

3

The prosecutor played a video recovered from an exterior security camera at a Burger King in the area. The prosecutor described the video as depicting defendant shooting with the gun aimed in front of him, not upward.

**b.     Expert testimony regarding gangs**

Officer Brandon Purece testified as the prosecution's gang expert, although no gang enhancement was alleged. Purece opined defendant was a member of a small gang called La Raza Loca that did not get along with any other gangs. Purece testified that saying "Fuck Mierdas" to MS13 members was both a challenge and a warning of impending violence. Purece further testified that shooting at rival gang members enhances both a gang's reputation and a shooter's status within his gang.

**2.     Defense case**

Clinical psychologist Dr. Catherine Scarf testified defendant has an IQ of 66, which indicates "borderline intellectual functioning." Scarf found defendant deficient in "non-verbal reasoning" and working memory, and "borderline" for "processing speed." She explained that a person with this level of functioning might be gullible, lack common sense, or fail to understand what someone is saying and respond inappropriately or illogically, for example by misinterpreting a threat as being more serious that it actually is.

Defendant testified that he was not a gang member and denied that he had ever told police he was a gang member.

Defendant testified that the three boys identified themselves as members of MS13, made gang hand signs, and asked him where he was from, which defendant understood as a question about gang membership. Defendant had been beaten by members of MS13 about a year earlier and had experienced problems with MS13 members since his years in middle school. He told the boys he did not "bang" and kept walking.

The boys followed defendant and one of them said he was going to "fuck up" defendant. Defendant continued to walk and ignored the boys until he heard one of them threaten to kill him. Defendant knew they were "juveniles," but there were three of them,

4

and defendant was scared. He turned and fired two shots into the air. The boys ran, and defendant crossed the street.

Defendant admitted that after he was in custody he wrote a statement for the police saying, "'They were going to kill me so I got scared, and I saw that one of them was going to pull something from his pockets so I started to go away.'" He also wrote, "'I never said I was going to kill them or anything like that. I was just scared for my life, so I fired two shots to the air.'"

Defendant explained that he had been drinking brandy and taking methamphetamine for several days straight. He was wearing one glove because it was cold out, but he had lost the other glove. He was carrying the gun, which he stole from his drug dealer a few days before, because "people" had threatened him.

Defendant denied telling any police officers that he was hunting MS13 members or that he intended to hurt or kill the boys. He admitted suffering a prior felony conviction for making a criminal threat at his place of employment in 2005, but he was inebriated and remembered only that he argued with a security officer. The parties stipulated that, because of the prior felony conviction, defendant was precluded from owning or possessing a firearm.

Defendant also presented evidence tending to show that Allan and Luis (or one of them) participated in an altercation resulting in a head injury to one of their neighbors in an unrelated incident during the month after the charged shooting.

### 3. Prosecution's case in rebuttal

Two LAPD officers testified that defendant admitted membership in the La Raza Loca gang in 2000 and 2010.

LAPD Officer Bryan Delavan, testified that he spoke to defendant after arresting him on the day of the shooting. Defendant did not appear to be under the influence of methamphetamine and did not seem to be "particularly inebriated." Defendant said he belonged to the "La Raza Trece" gang. He further stated that when he was growing up,

5

the MS13 gang was "kind of a problem." He did not get along with MS13, and MS13 had bothered his younger brother.

On the day after the shooting, LAPD Officer Brian Oliver spoke with defendant at the jail. Defendant initiated the conversation and asked Oliver how much time he would get for "shooting at them." Oliver and defendant then spoke about defendant's background. Defendant said he began hating MS13 when members of that gang picked on, and "jumped" him in high school. Defendant told Oliver that earlier in the week MS13 members jumped his brother, and he wanted them to pay for what they had done. A few days prior to the charged shooting, defendant and some of his friends drove around with a gun, "hunting" for MS13 gang members in the area of Santa Monica and Western. Defendant knew that MS13 members congregated at that location, but he and his friends did not find any MS13 members that day. Defendant told Oliver that he felt that shooting an MS13 gang member would cause them to leave his brother alone.

Regarding the charged shooting, defendant told Oliver that he thought if he shot one of the boys, the boy would not live; he was aiming at one that was wearing a long sweat shirt but he would have shot all three; he had a bullet for each of them; his shots missed because he was a little drunk.

The prosecution also presented additional evidence regarding the 2005 incident leading to defendant's criminal threat conviction.

### 4. Verdict and sentence

The jury convicted defendant of attempted murder and assault with a firearm with respect to each of the three boys, plus possession of a firearm by a felon. The jury found defendant personally used a firearm and personally and intentionally fired a firearm (§ 12022.53, subds. (b), (c)) in the commission of each attempted murder, and he personally used a firearm (§ 12022.5, subd. (a)) in the commission of each assault with a firearm. Defendant admitted an allegation pursuant to the Three Strikes law (§ 667, subs. (b)–(i)) that he had suffered a prior serious or violent felony conviction. Defendant was not asked to admit, and did not admit, a prior serious felony enhancement allegation (§

6

667, subd. (a)(1)).  The prosecution offered no proof to support the section 667, subdivision (a)(1) allegation.

The court sentenced defendant to prison for 35 years, consisting of a second strike term of 10 years for the attempted murder of Luis, plus 20 years for the section 12022.53, subdivision (c) enhancement, plus 5 years for the section 667, subdivision (a)(1) enhancement that had been neither proved nor admitted.  The trial court made the terms on the other two attempted murders and the possession of a firearm by a felon count run concurrently and stayed the terms on the assault with a firearm convictions.

## DISCUSSION

**1.      Admission of strike and enhancement allegations**

**a.      Defendant's admission**

After the jury returned its verdicts, the trial court asked defense counsel whether defendant would "stipulate to the prior conviction of a strike prior within the meaning of Penal Code section 1170 et seq. and 667.5 et. seq. as well?"  Defense counsel replied, "Yes."  The court then asked defendant, "[A]re you willing to admit that within the meaning of the Penal Code, that you have suffered a prior serious felony in case BA 293630, a violation of Penal Code section 422, that being a prior strike conviction in 2006.  [¶]  Do you admit that prior conviction?"  Defendant said, "Yes."

**b.      Defendant's admission of the strike allegation was involuntary, and he did not admit the section 667, subdivision (a)(1) enhancement allegation**

Defendant contends his "admission to a prior strike and serious felony conviction" cannot be deemed to have been voluntary and intelligent because he was not advised of his rights to a jury trial, confrontation, and the privilege against self-incrimination, nor was he advised of the consequences of his admission.  The Attorney General aptly concedes this contention and asks this court to reverse the true finding on defendant's "prior conviction allegation" and remand for a new trial of that allegation.

We agree that the failure to advise defendant of the rights he would relinquish in order to admit the strike allegation and the section 667, subdivision (a)(1) enhancement

7

allegation rendered defendant's admission involuntary. (*People v. Howard* (1992) 1 Cal.4th 1132, 1175, 1179; *In re Yurko* (1974) 10 Cal.3d 857, 863–864.)

We further note that the trial court only asked defendant to admit the strike allegation. The court did not ask defendant to admit the section 667, subdivision (a)(1) enhancement allegation, defendant did not admit it, and the prosecution did not offer any proof of this enhancement allegation. The trial court nonetheless applied the enhancement allegation, adding a five-year enhancement to defendant's sentence.

Accordingly, we reverse the trial court's implied findings on both the strike and section 667, subdivision (a)(1) allegations and remand for a new trial upon these allegations.

**2.      Denial of motion for acquittal**

**a.      Motion for acquittal**

At the close of the prosecution's case-in-chief, defendant moved for acquittal of the attempted murder and assault with a firearm charges pertaining to Angel (counts 5 and 6). The trial court denied the motion after noting that Luis testified that Angel was "within arm's reach" of Allan.

Defendant contends the denial of his motion for acquittal pursuant to section 1118.1 was error with regard to the attempted murder charge in count 5 because defendant fired only two shots from a distance of 40 to 50 feet, no one was struck by the shots, and the record did not show that all three boys "were directly in the line of fire," "two bullets could have struck all three" boys, or defendant "intended to kill all three with two bullets."

**b.      Evaluating sufficiency of evidence for a section 1118.1 motion for acquittal**

When reviewing a claim the trial court erred by denying a motion for acquittal under section 1118.1, we apply the same standard as when evaluating the sufficiency of evidence to support a conviction, but we consider only the evidence in the record at the time the motion was made. (*People v. Augborne* (2002) 104 Cal.App.4th 362, 371; *People* v. *Smith* (1998) 64 Cal.App.4th 1458, 1464.) Thus, we review the evidence

presented during the prosecution's case-in-chief in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. (*People v. Tully* (2012) 54 Cal.4th 952, 1006.)

c.      **Legal principles applicable to attempted murder of multiple individuals**

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "[A] person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*People v. Stone* (2009) 46 Cal.4th 131, 140.) "'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ."'" (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Where there are multiple alleged victims, the prosecution must prove that defendant intended to kill each victim, and the defendant's guilt must be judged separately as to each victim. (*People v. Perez* (2010) 50 Cal.4th 222, 230 (*Perez*).)

Where a defendant shoots at a group of people, the maximum number of attempted murder victims will generally be equal to the number of shots fired, absent evidence that defendant specifically intended to kill two or more people with a single shot or specifically intended to kill a greater number of victims but was thwarted from firing the required additional shots by circumstances beyond his control. (*Perez*, *supra*, 50 Cal.4th at pp. 230–231; *People v. McCloud* (2012) 211 Cal.App.4th 788, 807 (*McCloud*) [where defendants fired 10 shots and 2 victims were killed, evidence supported 8 attempted murder convictions].)

For example, in *Perez*, *supra*, 50 Cal.4th 222, the defendant fired one shot at a distance of 60 feet, from a car going 10 to 15 miles per hour, at a group of seven police officers and one civilian whom he believed to be rival gang members. The shot struck and injured one officer. (50 Cal.4th at pp. 226–227.) Perez was convicted of seven

counts of attempted murder of a peace officer, one count of attempted murder, and other offenses. The Supreme Court reversed all of the attempted murder convictions for insufficiency of evidence of intent to kill except the one pertaining to the injured officer, explaining, "In this case there is no evidence that defendant knew or specifically targeted any particular individual or individuals in the group of officers he fired upon. Nor is there evidence that he specifically intended to kill two or more persons with the single shot. Finally, there is no evidence defendant specifically intended to kill two or more persons in the group but was only thwarted from firing off the required additional shots by circumstances beyond his control. Without more, this record will not support conviction of eight counts of premeditated attempted murder." (*Id.* at pp. 230–231, fns. omitted.) Although Perez "endangered the lives of every individual in the group into which he fired the single shot," (*id.* at p. 225), which supported his eight assault with a firearm convictions, merely endangering them did not demonstrate an intent to kill.

The "kill zone" theory argued by the prosecutor in the trial court and the Attorney General here addresses specific intent to kill all persons within a certain zone through use of a weapon so pervasively lethal that it is expected to kill all persons within the zone. The "kill zone" theory first was recognized by the California Supreme Court in *People v. Bland* (2002) 28 Cal.4th 313. The Court held that although the doctrine of transferred intent is inapplicable to attempted murder (*id.* at p. 331), the nature and scope of an attack directed at a primary victim may support an inference that the defendant concurrently intended to kill everyone in the kill zone. Quoting a Maryland case, *Bland* provided examples of the types of attacks that would support a theory of concurrent intent to kill, including "'plac[ing] a bomb on a commercial airplane intending to harm a primary target on board'" while ensuring the death of all other passengers as well or attacking the primary target and his or her companions by means of a spray of automatic weapon fire or an explosive device. (*Id.* at pp. 329–330.)

However the "kill zone" theory does not apply when a defendant merely endangers more than one person. As this division explained in *McCloud*, *supra*, 211 Cal.App.4th at

10

p. 798, "The kill zone theory thus does *not* apply if the evidence shows only that the defendant intended to kill a particular targeted individual but attacked that individual in a manner that subjected other nearby individuals to a risk of fatal injury. Nor does the kill zone theory apply if the evidence merely shows, in addition, that the defendant was aware of the lethal risk to the nontargeted individuals and did not care whether they were killed in the course of the attack on the targeted individual. Rather, the kill zone theory applies only if the evidence shows that the defendant tried to kill the targeted individual *by killing everyone in the area in which the targeted individual was located*. The defendant in a kill zone case chooses to kill *everyone* in a particular area as a means of killing a targeted individual within that area. . . . [¶] The kill zone theory consequently does not operate as an exception to the mental state requirement for attempted murder or as a means of somehow bypassing that requirement. In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk. Rather, the defendant *specifically intends* that *everyone* in the kill zone die. If some of those individuals manage to survive the attack, then the defendant—having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result—can be convicted of their attempted murder."

**d.     At the time of defendant's motion for acquittal, the evidence supported only two counts of attempted murder**

At the conclusion of the prosecution's case-in-chief, the evidence showed that defendant had fired two shots in the direction of the three boys, from a distance of 40 to 50 feet. The firing of two shots supported an inference that defendant specifically intended to kill two boys. As demonstrated in *Perez*, however, the firing of two shots did not indicate an intent to kill the third boy without evidence that defendant  specifically intended to kill two or more of the boys with a single shot, or was thwarted from firing the third shot by circumstances beyond his control such as a malfunction of his gun or a bystander thwarting him. Thus, the firing of two shots supported, at most, two counts of attempted murder. There was no evidence that defendant specifically intended to kill two

11

or more of the boys with a single shot or specifically intended to kill all three boys but was thwarted from firing the required additional shots by circumstances beyond his control. Nor was there any evidence that it was either possible, or defendant believed or had reason to believe it was possible, to kill more than one person with a single shot.

Although the police recovered defendant's revolver, the prosecution introduced no evidence of its caliber. Therefore, there was no evidence indicating defendant had the ability to penetrate two boys with a single high-caliber round fired from a distance of 40 to 50 feet. Thus, there was insufficient evidence at the close of the prosecutor's case-in-chief to support an inference that defendant specifically intended to kill all three of the boys. Accordingly, the trial court should have granted defendant's section 1118.1 motion with respect to one of the attempted murder charges. Because defendant's motion was addressed to the counts naming Angel as the victim, the trial court should have granted the motion with respect to count 5.

The Attorney General's brief on appeal is deficient in part because it relies upon matters in defendant's various statements to the police, which were not introduced until the prosecution's rebuttal case. Because defendant is challenging the denial of his section 1118.1 motion, not the sufficiency of evidence to support his convictions, we do not consider evidence introduced after the section 1118.1 motion.

The Attorney General's brief on appeal also lacks merit to the extent it relies upon the kill zone theory. Firing two shots of unspecified caliber at three boys from a distance of 40 to 50 feet was not an application of force so pervasively lethal that it is reasonable to infer defendant intended to kill everyone in the area at which he fired in order to kill one or more primary targets.

The Attorney General also relies upon *People v. Chinchilla* (1997) 52 Cal.App.4th 683 and *Smith*, *supra*, 37 Cal.4th 733, both of which concluded the evidence was sufficient to support two attempted murder convictions where the defendant fired a single shot at two people who were lined up, one behind the other. Neither case supports the trial court's denial of defendant's 1118.1 motion in this case.

12

In *Chinchilla*, *supra*, 52 Cal.App.4th 683, defendant fired a single shot at two police officers who were crouched, with one "crouched down behind and 'just above'" the other. (*Id.* at p. 687.) Although Chinchilla challenged the sufficiency of the evidence to support two attempted murder convictions, he "conceded that one shot could support a conviction on two counts of attempted murder if there was evidence that the shooter saw both victims." (*Id.* at p. 690.) The appellate court concluded it was reasonable to infer that defendant saw both officers, and held, "Where a defendant fires at two officers, one of whom is crouched in front of the other, the defendant endangers the lives of both officers and a reasonable jury could infer from this that the defendant intended to kill both." (*Id.* at p. 691.)

If two of the three boys toward whom defendant fired had been in a single-file line and defendant had aimed one of his shots at the boy at the front of that line, the evidence in the present case might support an inference that defendant specifically intended to kill all three boys. That was not what happened in this case. Either all three boys were alongside one another or Luis and Allan were alongside one another and Angel was somewhere behind them. The latter scenario does not mean that Angel was directly behind Luis or Allan. Angel may have been behind the gap between Luis and Allan. Accordingly, *Chinchilla* is distinguishable.

Similarly, in *Smith*, *supra*, 37 Cal.4th 733, the defendant fired one .38-caliber shot at the rear windshield of a car pulling away from a curb. The driver (Smith's former girlfriend) testified that defendant fired from directly behind her, and her baby was in an "infant car seat in the backseat directly behind her." The bullet struck the driver's headrest and barely missed both the driver and the baby. Just before he shot, Smith had walked up to the open passenger-side front window and looked inside the car, and defendant admitted in his trial testimony that he had seen the baby in the car. (*Id.* at pp. 736–738.) The Supreme Court rejected Smith's contention that the evidence was insufficient to support attempted murder convictions with respect to both the driver and her baby, explaining, "The ballistics evidence established that the large-caliber bullet

13

defendant fired into the vehicle from a distance of one car length away missed the mother *and* baby by a matter of inches. Defendant's own testimony established he knew the baby was in the backseat positioned directly behind the mother, and hence directly in his line of fire when he fired the shot into the vehicle. When the facts are considered under the standard of review applicable to this sufficiency of evidence claim, . . . we find the evidence sufficient to support the jury's finding that defendant acted with intent to kill the baby." (*Id.* at pp. 746–747.)

*Smith* is also distinguishable from the present case. Here there was no evidence that two of the three boys were directly behind one another and in defendant's direct line of fire. Nor was there evidence of the caliber of defendant's revolver, and defendant was much farther than one car-length away from the boys when he shot toward them.

Given the state of the evidence at the close of the prosecution's case-in-chief, the trial court erred by denying defendant's section 1118.1 motion with respect to count 5. Accordingly, we reverse the conviction as to that count. This reversal does not affect defendant's conviction of assault with a firearm with respect to Angel (count 6) or the length of defendant's sentence because the term for count 5 runs concurrently with the term on count 1.

### 3. Error in authority for firearm enhancement

We note that both the trial court's sentencing minute order and the abstract of judgment indicate that the 20-year firearm enhancement was imposed pursuant to section 12022.53, subdivision (e), which was inapplicable in this case. During the sentencing hearing, the trial court cited section 12022.53, subdivision (a) as authority for the enhancement. The correct authority is section 12022.53, subdivision (c). On remand, the trial court should issue an amended abstract of judgment correcting this error.

### DISPOSITION

Defendant's conviction for the attempted murder of Angel N. (count 5) is reversed for insufficient evidence and may not be retried. The trial court's implied findings upon the Penal Code section 667, subdivision (a) and strike (§§ 667, subds. (b)–(i), 1170.12)

14

allegations are reversed and the cause is remanded for a new trial upon those allegations. The judgment is otherwise affirmed. The court is directed to issue an amended abstract of judgment that includes citation of Penal Code section 12022.53, subdivision (c) as authority for the 20-year firearm enhancement to defendant's sentence.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


ROTHSCHILD, Acting P. J.


CHANEY, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.