Filed 2/24/15  P. v. White CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rule s of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARCHELL MYKEON WHITE,<br><br>    Defendant and Appellant. | B253410<br><br>(Los Angeles County<br>Super. Ct. No. MA057059) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed in part, and reversed in part with directions.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Marchell Mykeon White was convicted by a jury on count 1 of the second degree murder of Terry Jones (Pen. Code,[1] § 187, subd. (a)), with special findings that he personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)). The jury also convicted White on count 2 of attempted voluntary manslaughter of Ena Bourne (§§ 192, subd. (a), 664), with a special finding that he personally used a firearm (§ 12022.5, subd. (a)). The jury found a gang allegation (§ 186.22, subd. (b)) not to be true.

The court found true the allegation that White had a prior conviction for a violent or serious felony under the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), one prior serious felony conviction within the meaning of section 667, subdivision (a)(1), and one prior prison term within the meaning of section 667.5, subdivision (b). The court sentenced White to an aggregate state prison term of 71 years to life.

On appeal, White contends he should not have been convicted of the attempted voluntary manslaughter of Bourne because there was insufficient evidence to prove he had the specific intent to kill. At issue in this case is whether there was sufficient evidence to support the jury's finding that White intended to kill Bourne under a "kill zone" or other attempted murder theory. White also argues, and the People do not dispute, that the court improperly imposed a five-year enhancement for use of a firearm on count 2 under section 12022.5, subdivision (a).

We affirm the conviction, but remand for resentencing on count 2.

---

[1]     All statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Testimony at Trial*[2]

  1. *The Prosecution's Witnesses*

    a. Shooting of Jones

On June 28, 2012, Los Angeles County Sheriff's Department Deputy Jason Godecke responded to a shooting call at the Beechwood Apartments in Lancaster between 10:00 and 10:15 p.m. He saw a large crowd gathering in the area between the office building for the apartment complex and apartment building 25. He estimated there were "60 plus" people in the crowd. He saw Jones lying on the ground in a pool of blood. Godecke checked Jones for a pulse but did not feel one, and at some point Jones was declared dead.

Dahji Reed was the principal witness for the prosecution. Reed testified that on June 28, 2012, she was visiting her grandmother at the Beechwood Apartments. Jones[3] was her cousin, and that night he was also at the apartment complex. Reed knew White by the name "Hand."

Reed was in her friend's apartment when she overheard an argument, and went outside to see what was happening. She testified that there was "a lot of commotion because it was a lot of men outside." Reed heard Jones and White arguing, and White said, "Blood let's go to the back." She followed the two men and the crowd to the back of the fire lane.[4]

Reed could see Jones and White at the end of the fire lane, but could not hear what they were saying. Many other people were around them. Jones and White started

---

[2]   White waived his right to counsel, and represented himself at trial.

[3]   Some witnesses referred to Jones as "T.J."

[4]   The prosecutor played the videotape of the incident for the jury as Reed testified. The videotape shows the crowd gathering in the back of the apartments, Jones falling down, and then the crowd running.

throwing punches at one another. On the photograph of the apartment complex marked as Exhibit 2, Reed described the area where the fight took place as between buildings 14 and 25.[5] Reed heard Jones say he was "gonna knock [White] out and beat [his] ass." The punching lasted three minutes. Reed described the crowd around White and Jones as "pumping up the fight." The court asked whether this meant that the crowd was "[k]ind of egging everybody on?" Reed responded, "Basically."

Reed then saw White pull a .38 special revolver out of his right pocket.[6] She heard White say, "I'm not fighting no more. I'm killing niggers."[7] Reed testified that she saw White shoot at Jones, who was unarmed. The first shot hit Jones, but Jones kept running down the cement walkway. It was "probably . . . after the third shot," when Jones fell. Reed heard "[m]aybe five" shots.[8] According to Reed, after the first shot, people in the crowd scattered. White ran away, but soon came back. Reed testified that after the shooting "[Jones] was laying in the middle of the floor and [White] pistol-

_____

[5]    Reed described her location in the videotape as the person in the white pants in the lower right of the videotape as Jones and White started throwing punches at one another. Reed's location and the group of people gathered around the fight can be seen both in the videotape and two stills of the videotape marked as Exhibits 11 (before the shooting) and 12 (after the first shot).

[6]    Reed testified she saw the gun the night before when White pulled it on her after she declined a smoke on "his blunt." But after she said she did not smoke, he put the gun back in his pocket.

[7]    On direct examination, Reed testified that White said, "Blood, I'm not fighting no more. I'm killing people." When the prosecutor asked Reed a second time about the shooting, she testified that White said, "Blood, I'm not fighting no more. I'm killing niggas." On cross-examination by White, Reed said, "Your exact words was, 'I'm not fighting no more. I'm killing niggers.' That was your exact words."

[8]    The exact number of shots is disputed. During the defense case, the prosecutor asked White, "You shot what; three or four times?" White responded, "Somewhere around there, sir." The prosecutor asked, "At [Jones]; right?" White said, "Yes." No other witnesses testified as to the number of shots fired.

whipped him. [White] hit him with the gun three times and he ran off." Later White returned and looked on while Jones was dying.

Maurice Blackwill testified that he lived with his children at the Beechwood Apartments at the time of the shooting. He stayed in his apartment during the shooting. He heard someone yelling that he didn't want to fight. He also heard gunshots. When asked how many people were outside where the arguing and fighting was, Blackwill testified that "[e]verybody that lived in the Beechwoods was outside that night."

Dontell Jenkins testified he knew "Ham," a moniker for White. Jones was Jenkins' "blood cousin." On the night of the shooting, Jenkins was playing cards at the Beechwood Apartments, when Jones and White came over to the area. They were having a "confrontation." Then Jones and White went to the back. Jenkins followed to the back and saw a crowd gathered there. Jenkins testified that the fight took place in the middle of the fire lane, between buildings 14 and 25 on Exhibit 2. Then he heard "multiple shots," and took off running.

Jazzlym McBride testified that she knew White and Jones. On the night of the shooting, she heard them arguing, and White said he did not want to fight. She saw White and Jones go to the back where the parking was. McBride saw White and Jones "throwing fists" at each other. The prosecutor asked McBride to "circle the area you're talking about where you heard them arguing and fighting" on the photograph of the apartment complex identified as People's Exhibit 2.[9] In response, McBride drew a black oval on Exhibit 2, which is placed in the alley between buildings 13 and 14 on the left of the photograph and buildings 25 and 26 on the right of the photograph. Notably, on Exhibit 2, apartment 70 (where Bourne lived, discussed below) is the upstairs apartment in building 13.

McBride then testified as follows:

"Q    Where did the shooting take place?

---

[9]    The prosecutor referred to the photograph as Exhibit 3, but it was clear from the context that he was referring to Exhibit 2.

5

"A    Between the two buildings.

"Q    Right where this oval is?

"A    Yes."

McBride testified that she next heard White say, "Hunnas.  I'm tired of fighting." McBride testified that "Hunnas" is what the gang Bounty Hunters sometimes called themselves.  McBride saw White point his hand towards Jones and she heard a gunshot, but she did not see what White did.

Los Angeles County Sheriff's Department Detective Daniel Welle testified as a gang expert.  He testified that Jones was a member of a gang known as the Village Town Piru Blood, with the moniker "T.J. RU."  Welle saw field identification cards showing that White was a member of the Bounty Hunter Bloods gang, with the monikers Ham, Li'l Hands, and Hands.  In response to a hypothetical question, Welle testified that the shooting was done for the benefit of the Bounty Hunter Bloods.

Dr. Kevin Young performed the autopsy on Jones.  Dr. Young testified that the cause of death was gunshot wounds to the chest.  He testified that there was "one definite gunshot wound to the chest, which was fatal."  He also found "two probable gunshot wounds to the abdomen," which did not penetrate the skin but were consistent with gunshot wounds.  Jones also had a laceration on the top of his head that was consistent with being hit by a metal object such as the butt of a gun.

b. Shooting of Bourne

Bourne did not testify at the trial.  The prosecution instead relied on testimony from Los Angeles County Sheriff's Department Detective Sandra Nava, Deputy Lee Warren, and Blackwill.  During Nava's testimony, a 911 call from Bourne was played for the jury, in which Bourne said she had been shot in the leg and was calling from apartment 70.  When asked during the call where she was, Bourne responded, "I'm in my

6

apartment. I just ran up here."[10] Warren responded to a call that there was a second gunshot victim and contacted Bourne in apartment 70. Warren observed that there appeared to be one gunshot wound to the right side of Bourne's buttocks. Blackwill likewise testified that Bourne "told me she was shot."

Nava identified Bourne as the person in a photograph shown to the jury. Nava testified that Bourne lived in apartment 70, and Nava talked to her sometime after the shooting. Nava tried to contact Bourne again to have her testify in court but was unable to find her. Nava learned that Bourne had moved and there was no forwarding address.

2. *White's Testimony*

White was the only defense witness. White testified the first fight with Jones was in the street near the parking garage. White kept telling Jones he did not want to fight, but Jones hit White in the face three times. People who had gathered pulled White and Jones apart. White told Jones he did not want to fight anymore and walked away into the parking garage.

White then walked down toward the playground where Reed, Jones's family and Jenkins were talking. Then Jones approached White again, and Jones said, "Let me holler at you." Jones and White walked toward the back of the apartment complex. As they walked towards the back, Jones said, "I'm gonna knock you out." White told him he did not want to fight, but Jones kept trying to press White to fight and, according to White, Jones "kept running up on me." White testified, "I felt like [Jones] was trying to hurt me." When they started walking toward the back of the apartment complex, a crowd had formed, and everyone started moving to the back.

According to White, "[Jones] come around from the crowd and rush [*sic*] me again . . . [and] hit me a couple times." White never threw any punches at Jones. He was

---

10      The videotape and Exhibit 2 show the staircase to the upstairs apartment originates on the fire lane where McBride placed the black oval.

7

trying to block Jones's punches.  White said that he kept telling Jones that he did not want to fight, and Jones kept trying to fight.

Jones came up to White a third time, saying "I'm gonna beat you up."  Jones was almost running through the crowd.  White felt Jones was not going to stop, and White was scared.

White had a loaded gun in his pocket.  White testified, "I really just pulled it out and just start shooting."  When the prosecutor asked White if "[t]he direction that [White] shot was right at Jones," White testified, "Yes."  The prosecutor asked, "There was a large group of people around there?"  White replied, "Yes, sir."

White said he was just trying to get Jones away from him.  White shot "somewhere around" three or four times at Jones.  White was right behind Jones and saw Jones fall to the ground.  White acknowledged that when he pulled out his gun, Jones started running.  White saw all the people around, but he did not "even have no time to think . . . ."  White also hit Jones's head with the gun itself, lacerating his head.

White later learned from the detective that he also shot Bourne.  According to White, from the first fight to the shooting at Jones, less than 10 minutes had elapsed. White testified he had known Jones for over a decade and they were friends.  He said, "I didn't want to take his life, but he kept trying to fight me. . . .  I'm sorry. . . .  I wish I could go back in the hands of time and bring back [Jones]."

## B.  *Jury Instructions*

The jury was instructed on count 1 as to Jones on first degree murder and the lesser included offense of second degree murder.  On count 2 as to Bourne, the court instructed the jury on attempted murder and the lesser included offense of attempted voluntary manslaughter.  On count 2, the court also instructed the jury with the "kill zone" instruction (CALJIC No. 8.66.1), as follows:  "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk.  This zone of risk is termed the 'kill zone.'  The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is

8

reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity. Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a 'kill zone' is an issue[] to be decided by you." White did not object to the court giving the kill zone instruction.

## C. *Verdict and Sentencing*

The jury found White guilty on count 1 of the second degree murder of Jones (§ 187, subd. (a)), and found all the gun allegations to be true (§ 12022.53, subds. (b), (c) & (d)). As to count 2, the jury found White guilty of the lesser included offense of attempted voluntary manslaughter (§§ 192, subd. (a), 664), and found the allegation that White personally used a firearm (§ 12022.5, subd. (a)) to be true. As to both counts, the jury found the gang allegation (§ 186.22, subd. (b)(4)) to be not true.

The court sentenced White to state prison for a total aggregate term of 71 years to life. On count 1, the court imposed a sentence of 15 years to life for the second degree murder of Jones, doubled as a second strike under the three strikes law for a total of 30 years to life, and a consecutive term of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)).[11]

On count 2, the court sentenced White to the mid-term of three years for attempted voluntary manslaughter (§§ 192, subd. (a), 664), doubled under the three strikes law, for a total of six years, plus a consecutive five-year term for the firearm enhancement (§ 12022.5, subd. (a)). On appeal it is undisputed that the five-year firearm enhancement was unauthorized because section 12022.5 requires that the court impose an additional consecutive sentence of three, four or 10 years. Finally, the court imposed a five-year

---

[11]    The court stayed the 10-year firearm enhancement pursuant to section 12022.53, subdivision (b), and the 20-year firearm enhancement pursuant to section 12022.53, subdivision (c), pursuant to section 654. The court also struck the one-year enhancement under section 667.5, subdivision (b).

enhancement under section 667, subdivision (a)(1), for White's prior conviction of a serious felony.

## DISCUSSION

### A. *Standard of Review*

"""""The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]"' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 738-739; accord, *People v. Perez* (2010) 50 Cal.4th 222, 229; *People v. Snow* (2003) 30 Cal.4th 43, 66.) Our task in the instant case is to determine whether there is sufficient evidence to support the jury's finding that White acted with a specific intent to kill to convict him of attempted voluntary manslaughter. (See *Perez*, *supra*, at p. 233 ["the evidence is insufficient to establish that defendant acted with the intent to kill two or more individuals by firing the single shot at the group of seven officers and a civilian"].) """"[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" [Citation.]' [Citation.]" (*Smith*, *supra*, at p. 739.)

### B. *Attempted Murder and Attempted Voluntary Manslaughter Require a Specific Intent To Kill*

White contends there was insufficient evidence that he had the specific intent to kill required for conviction of attempted murder or attempted voluntary manslaughter.

10

We begin our analysis by addressing the mental state required for the greater crime of attempted murder.[12]

The mental state required for attempted murder is different from that required for murder. "Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices." (*People v. Bland* (2002) 28 Cal.4th 313, 327 (*Bland*); accord, *People v. Perez*, *supra*, 50 Cal.4th at p. 229.) By contrast, implied malice cannot support a conviction for attempted murder, which requires intent to kill. (*Bland*, *supra*, at pp. 327-328; *Perez*, *supra*, at p. 229.) As the court held in *Perez*, "'"[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." [Citations.]' [Citation.]" (*Perez*, *supra*, at pp. 229-230, fn. omitted.)

The court in *Bland* discussed the difference between the intent required for murder and attempted murder by explaining that the doctrine of transferred intent does not apply to attempted murder: "Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder—due to transferred intent—if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. . . . Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Bland*, *supra*, 28 Cal.4th at p. 328.)

Voluntary manslaughter is a lesser included offense of murder when the required element of malice is negated by a sudden quarrel or heat of passion, or by an unreasonable but good faith belief in the necessity of self-defense. (See *People v. Beltran* (2013) 56 Cal.4th 935, 942, 951; *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.) The crime of attempted voluntary manslaughter requires proof of intent to kill. (*People v.*

_____

[12] As we discuss below, there was insufficient evidence of heat of passion or imperfect self defense as to Bourne, so the verdict can only be upheld if there was sufficient evidence to support the greater offense of attempted second degree murder.

11

*Montes* (2003) 112 Cal.App.4th 1543, 1546-1547 [reversing conviction for attempted voluntary manslaughter where reasonable probability jurors based verdict on defendant's conscious disregard for life]; *Gutierrez*, *supra*, at p. 710 [upholding refusal to instruct on lesser offense of attempted voluntary manslaughter where lesser based on conscious disregard for life].) As the court held in *Montes*, "If the crime of attempted murder requires a specific intent to bring about a desired result (the killing of a human being), then it appears to us that the crime of attempted voluntary manslaughter must also require a specific intent to bring about that same desired result (the killing of a human being)." (*Montes*, *supra*, at pp. 1549-1550.)

In this case, there was no claim that, as to Bourne, malice was negated by a sudden quarrel or heat of passion, or by an unreasonable but good faith belief in the necessity of self-defense. Rather, the People relied on a "kill zone" theory of concurrent intent to support a guilty verdict on count 2 for the attempted murder or attempted voluntary manslaughter of Bourne.

## C. *Under a "Kill Zone" Theory, the People Must Prove That White Intended To Kill Jones by Killing Everyone in the Group Around Him*

### 1. *The "Kill Zone" Theory of Concurrent Intent To Kill*

Our Supreme Court first articulated the "kill zone" theory for attempted murder in in *Bland*, holding: "'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. . . . Where the means employed to commit the crime against a primary victim creates a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'" (*Bland*, *supra*, 28 Cal.4th at pp. 329-330.)

The court in *Bland* gave as examples of a kill zone an assailant who places a bomb on a commercial plane intending to harm a primary target on the plane by killing all passengers on the plane, and where a defendant attacks a group of people by using

"'automatic weapon fire or an explosive device devastating enough to kill everyone in the group.'" (*Bland*, *supra*, 28 Cal.4th at p. 330.) In these scenarios, "'[t]he defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.'" (*Ibid*.)

In *Bland*, the court found that where the defendant and a second shooter fired a flurry of bullets at a fleeing car in order to kill the driver, injuring two passengers, the evidence "virtually compels" an inference that the defendant created a kill zone that would support attempted murder convictions as to both passengers. (*Bland*, *supra*, 28 Cal.4th at pp. 330-331, 333.)

By contrast, in *Perez*, our Supreme Court found that the defendant had not created a "kill zone" where he fired a single shot from a moving car at a group of eight individuals 60 feet away, supporting only one, not eight, counts of attempted murder. The court held, "'a shooter may be convicted of multiple counts of attempted murder on a "kill zone" theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the "kill zone") as the means of accomplishing the killing of that victim.'" (*People v. Perez, supra*, 50 Cal.4th at p. 232.)

In *People v. Campos* (2007) 156 Cal.App.4th 1228, 1233, 1244, this district found that where the defendant pulled up in a truck four to five feet away from a car with a driver and two passengers, and "sprayed the car with nearly a dozen bullets, from close range," there was sufficient evidence to support attempted murder charges as to the passengers on a "kill zone" theory based on the intent of the defendant to kill everyone inside the car in order to kill the driver.

White relies on the decision of this district in *People v. McCloud* (2012) 211 Cal.App.4th 788, where the court found the kill zone theory did not support 46 attempted murder convictions where the defendants shot 10 shots into a crowded party because there was no evidence to show that "the defendant[s] [chose], as a means of killing the

13

primary target, to kill everyone in the area in which the primary target is located . . . ." (*Id.* at pp. 801, 803.)

The People argue that the five shots White fired here are like the "flurry of bullets" found to create a kill zone in *Bland* and *Campos*. White argues that the kill zone theory does not apply because there was no evidence that White intended to kill everyone around Jones in order to kill Jones. We do not reach this issue because we find substantial evidence that White expressly intended to kill African-American people in the crowd around Jones in addition to his intent to kill Jones.

2. *A Jury Can Find Express Malice Based on an Intent To Kill Someone in a Group of People*

In *People v. Stone* (2009) 46 Cal.4th 131, 136-138 and *People v. Smith*, *supra*, 37 Cal.4th at pp. 745-746, our Supreme Court again considered the kill zone theory, in each case finding it inapplicable, but upholding the attempted murder convictions on a different theory of express malice. In *Stone*, the court held that the kill zone theory did not apply where the defendant fired one shot into a crowd of people with the intent to kill one person, but not a specific named intended victim, although the court found that this would still support an attempted murder conviction. (*Stone*, *supra*, at pp. 140-141.) The court held: "An indiscriminate would-be killer is just as culpable as one who targets a specific person. . . . [A] terrorist who simply wants to kill as many people as possible, and does not know or care who the victims will be, can be just as guilty of attempted murder." (*Id*. at p. 140.)

In *Stone*, the defendant fired a single shot from 10 to 15 feet away at a group of 10 people. The information alleged one count of attempted murder of Joel F., one of the 10 individuals in the group. According to the testimony at trial, however, the defendant did not fire the gun at any particular person, but rather, at the group. The court held that the kill zone theory did not apply because there was no "primary target" in that the defendant intended to kill "someone" in the crowd, but did not specifically intend to kill Joel F. (*People v. Stone*, *supra*, 46 Cal.4th at p. 139.) The court held that the evidence still

supported an attempted murder conviction on the theory that "when no one dies that person [the shooter] *will* be guilty of attempted murder even if he or she intended to kill a random person rather than a specific one." (*Id*. at p. 141.)[13]

As this district held in *Campos,* in the context of the kill zone, "[a] defendant who shoots into a crowd of people with the desire to kill anyone he happens to hit, but not everyone, surely has the specific intent to kill whomever he hits, as each person in the group is at risk of death due to the shooter's indifference as to who is his victim." (*People v. Campos*, *supra*, 156 Cal.App.4th at p. 1243.)

In *People v. Smith*, the court upheld the defendant's conviction for two counts of attempted murder where he shot one bullet into a car and a mother and her baby were within the line of fire, but missed both by inches. The court upheld the convictions based on evidence of the defendant's animosity toward the mother and the baby's father to support a finding of his intent to kill both the mother and baby, but found that a kill zone theory did not apply to show the defendant intended to kill the mother by killing both of them with a single bullet. (*People v. Smith*, *supra*, 37 Cal.4th at pp. 746-747.)

The court held that the defendant's argument that the attempted murder conviction for the baby must be reversed absent evidence of a kill zone is "founded on the incorrect assumption that all single-bullet cases involving more than one attempted murder victim must be analyzed under a kill zone rationale. And it is further founded on the incorrect assumption that a shooter who fires a single bullet at two victims who are both, one behind the other, directly in his line of fire, cannot, as a matter of law, be found to have acted with express malice toward both victims." (*People v. Smith*, *supra*, 37 Cal.4th at p. 746.)

---

[13]    The court in *Stone* remanded the case on the issue of whether the information provided sufficient notice to the defendant of the attempted murder charge where it alleged intent to kill Joel F. instead of "someone" in the group of persons. (*People v. Stone*, *supra*, 46 Cal.4th at pp. 141-142.) In this case because no error was raised by White below or on appeal as to how he was charged in the information or the jury instructions given, we do not remand for the trial court to address this issue.

We find this case falls squarely within the holdings of *Stone* and *Smith* in that there was substantial evidence that White intended to kill "someone"—or multiple people—in the crowd of African-American people gathered around Jones. We next turn to the facts of this case.

3. *There Was Sufficient Evidence of Jones' Intent To Kill African-American People in the Crowd Around Jones*

We find there was sufficient evidence from which the jury could have found that White intended to kill "someone" or multiple people in the crowd that had gathered around Jones.[14] Most significantly, after the physical fighting ended, White said, "I'm not fighting no more. I'm killing niggers."[15] This statement by White supports a reasonable inference by the jury that White intended to kill one or more of the African-American people gathered around Jones, not just Jones.[16] Notably, White used the plural in describing whom he intended to kill—this case would be different if, for example, White said, "I'm going to kill you, nigger." The inference of an intent to kill other African-Americans in the crowd is also consistent with Reed's testimony that the crowd was egging White and Jones on as they were fighting, especially given that White did not

---

[14] Because the jury was instructed on count 2 both on attempted murder based on traditional principles of express malice and on the kill zone theory, the jury could have relied on either theory to find White guilty on count 2. In light of the fact that we find there was substantial evidence to support the attempted murder conviction based on evidence of express malice, we do not reach the question whether there was substantial evidence to support a kill zone theory. We also do not consider whether the court should have instructed the jury on the kill zone theory given that White did not raise instructional error below nor is it raised by White's counsel on appeal.

[15] While White used this racial epithet, we will refer to this statement as one by White that he intended to kill African-Americans.

[16] While the witnesses did not testify as to the ethnicity of the crowd, it appears from a review of the video shown to the jury that the crowd was comprised of African-American individuals. (See Exh. 6.) Also, the photograph of Bourne identified by Nava shows that she was African-American. (See Exh. 14.)

16

want to fight. Reed, Blackwill and Jenkins all described a crowd of people gathered at the time of the shooting, which is also evident from the videotape. White testified that he was aware of the crowd around Jones when he fired. He also described Jones as "almost running through the crowd." According to Reed, once White fired the first shot, people in the crowd scattered.

White argues that according to his own testimony, he was not thinking about the crowd as he fired on Jones. While White did testify that when he saw all the people around, he did not "even have no time to think," the jury could reasonably have discounted this self-serving testimony, instead focusing on White's statement that he was going to kill African-Americans.

Further, according to Reed's testimony, White hit Jones with the first and third shots, causing Jones to drop to the ground, but White fired a total of five shots. This provided additional evidence from which the jury could have concluded that White was continuing to fire his revolver into the crowd even after Jones was down.[17] While no evidence was presented as to Bourne's precise location, she was close enough to Jones to be wounded by a bullet. Further, Bourne's 911 call was played for the jury in which she stated that she had just run up the stairs into apartment 70, which apartment was above the area circled by witness McBride on Exhibit 2 as the area where the shooting took place. Accordingly, the jury could have made a reasonable inference that Bourne was in the crowd around Jones that started to disperse once the first shot was fired, which is confirmed by her sustaining a bullet wound to her buttocks.[18]

We therefore find that there was substantial evidence from which a rational trier of fact could find beyond a reasonable doubt that White intended to kill "someone" or

---

[17] No evidence was presented as to how many bullets White would have had in his gun, which was never recovered.

[18] While Bourne describes her injury in the 911 call as a gunshot wound to her leg, when Deputy Warren later contacted Bourne in her apartment, he observed a gunshot wound to Bourne's buttocks.

multiple African-Americans in the crowd around Jones, supporting an attempted second degree murder conviction.  (See *People v. Stone*, *supra*, 46 Cal.4th at pp. 140-141.)

**D.  *Where a Rational Jury Could Find a Defendant Guilty of a Greater Offense, Conviction of a Lesser Offense Will Be Upheld***

As White correctly argues on appeal, in order to find him guilty of voluntary manslaughter, the jury would need to have found that White acted in the heat of passion or imperfect self-defense.  (See *People v. Beltran*, *supra*, 56 Cal.4th at p. 942.)  It is undisputed that the People did not present any evidence to support one of these theories as to Bourne.  However, because we find that a rational jury could have found White guilty of attempted second degree murder on the state of the evidence, White cannot complain of the more favorable verdict of attempted voluntary manslaughter.  (See *People v. Lee* (1999) 20 Cal.4th 47, 52 [upholding verdict of voluntary manslaughter where insufficient evidence of provocation because evidence was sufficient for second degree murder conviction].)  As the court held in *Lee*, "in the absence of prejudice, a defendant may not complain of error favorable to the defendant, including the giving of correct, but inapplicable, instructions and return of a verdict of an offense less than that which the evidence shows."  (*Id.* at p. 57.)

**E.  *The Trial Court Imposed an Unauthorized Sentence on Count 2***

White and the People agree that the trial court erred by imposing a five-year term for the gun use enhancement under section 12022.5, subdivision (a).  Section 12022.5, subdivision (a), provides, "any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years . . . ."

On appeal, we have the inherent authority to correct an unauthorized sentence even where a defendant, as here, failed to object in the trial court.  (*People v. Scott* (1994) 9 Cal.4th 331, 354; *People v. Wilson* (2013) 219 Cal.App.4th 500, 518.)  However, because the selection of a term of imprisonment for the enhancement is a matter left to

the discretion of the trial court, the better approach (see *People v. Irvin* (1991) 230 Cal.App.3d 180, 192) is to remand the matter to the trial court for it to exercise its discretion under section 12022.5, subdivision (a), and to resentence White on count 2 with an authorized sentence not to exceed White's original sentence. (See *People v. Lai* (2006) 138 Cal.App.4th 1227, 1245.)

The People also point out that the abstract of judgment should be amended to reflect the correct Penal Code section as "PC 12022.5(a)" instead of "PC 12022.5." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [appellate court may order correction of clerical error at any time].) We direct the trial court to make this correction to the abstract of judgment.

## DISPOSITION

The judgment is reversed as to the five-year enhancement imposed on count 2 and the matter is remanded for the limited purpose of the court exercising its discretion with respect to sentencing on count 2 for the firearm enhancement (§ 12022.5, subd. (a)), and correcting the abstract of judgment to show that the firearm enhancement imposed as to count 2 was pursuant to subdivision (a) of section 12022.5. In all other respects, the judgment is affirmed.

FEUER, J.[*]

We concur:

PERLUSS, P. J.                    ZELON, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19